Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
03/02/2018 09:15 AM CST

DORI ANN OSANTOWSKI, APPELLEE, V.
BRIAN OSANTOWSKI, APPELLANT.

___ N.W.2d ___

Filed December 8, 2017.    No. S-16-807.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.

2. **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

3. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

4. **Judgments: Appeal and Error.** When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court.

5. **Divorce: Property Division.** The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case.

6. ____: ____. Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities

of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.

7. \_\_\_\_ : \_\_\_\_. Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance.

8. **Divorce: Appeal and Error.** Appeals in domestic relations matters are heard de novo on the record, and thus, an appellate court is empowered to enter the order which should have been made as reflected by the record.

9. **Agriculture: Crops: Animals.** Agricultural crops are categorically different in nature from a herd of cattle and, therefore, are not entitled to the same treatment for tracing purposes.

10. **Agriculture: Crops: Equity.** Courts are allowed flexibility in their treatment of stored and growing agricultural crops to account for the equities of the situation.

11. **Property Division: Appeal and Error.** As a general principle, the date upon which a marital estate is valued should be rationally related to the property composing the marital estate. The date of valuation is reviewed for an abuse of the trial court's discretion.

12. **Appeal and Error.** Absent plain error, errors argued but not assigned will not be considered on appeal.

13. **Appeal and Error: Words and Phrases.** Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.

14. **Appeal and Error.** Plain error may be asserted for the first time on appeal or be noted by an appellate court on its own motion.

15. **Property Division.** A nonowning spouse is entitled to some benefit when marital funds have been expended to improve or reduce the debt on the other spouse's nonmarital property.

16. **Divorce: Property Division: Alimony.** In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment.

17. \_\_\_\_ : \_\_\_\_ : \_\_\_\_. In addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2016), in dividing property and considering alimony upon a dissolution of marriage, a court should consider the

income and earning capacity of each party and the general equities of the situation.

18. **Property Division.** As a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case.

Appeal from the District Court for Seward County: James C. Stecker, Judge. Affirmed as modified.

John W. Ballew, Jr., and Adam R. Little, of Ballew, Covalt & Hazen, P.C., L.L.O., for appellant.

Stan A. Emerson, of Sipple, Hansen, Emerson, Schumacher & Klutman, for appellee.

Heavican, C.J., Wright, Miller-Lerman, Cassel, Stacy, Kelch, and Funke, JJ.

Funke, J.

Brian Osantowski appeals from a decree of dissolution entered by the Seward County District Court, which dissolved his marriage to Dori Ann Osantowski, divided the marital assets and debts, and ordered Brian to make an equalization payment of $680,000, distributing the estate about equally.

Brian argues that his premarital crops should have been treated similarly to a herd of cattle—as a single asset for tracing purposes, that the court made specific errors in the division of marital assets, and that its distribution of the marital estate was inequitable.

We reject Brian's argument that crops are similar to cattle herds for tracing purposes. However, we hold that the court erred in its division of certain marital assets and debts. Therefore, we affirm the district court's order as modified by this opinion.

## I. BACKGROUND

Brian and Dori were married on September 23, 2011, and separated on or about May 26, 2014. Dori filed a dissolution

complaint in June 2014. Trial was held on January 14 and February 12, 2016.

## 1. Parties' Marriage

During the marriage, Brian resided primarily in Polk County, Nebraska, at a residence owned by his parents. Dori maintained a residence in Lincoln, Nebraska, until May 2013. Dori testified that while she was living in Lincoln, she spent a minimum of three to four nights per week with Brian in Polk County during the academic year and full time during the summers and other school breaks. As of May 2013, Dori resided in Polk County full time and commuted to Lincoln for her final semester of school.

In September 2013, Dori held a master's degree in entomology from the University of Nebraska-Lincoln (UNL) and was enrolled in a doctoral program for plant health at UNL. She testified that while she had originally intended to pursue a Ph.D. in entomology at South Dakota State University, she enrolled in a program at UNL instead because Brian had objected to the distance. Dori also stated that she changed her program to plant health so that she could gain a better understanding of agriculture in Nebraska and contribute to the Osantowski farming operation.

Dori received a scholarship and a stipend for her school and living expenses. She also worked full time during the summers in Lincoln, earning between $8,000 and $20,000 in wages for 2011, 2012, and 2013 each. Most of Dori's income and scholarship money during the marriage went to tuition, insurance payments, payments for her motorcycle, commuting expenses, rent and utilities for the Lincoln apartment, and other living expenses. She testified that Brian provided minimal financial support to her during the marriage, but what he did provide was used for the household expenses she paid for the Polk County residence. In February 2014, Dori began working full time for an annual salary of $75,000 and obtained medical and dental insurance for herself and Brian.

Brian began farming in 2005. He has a farming operation with his two brothers in and around Polk County. Under the operation, Brian and his brothers own equipment separately but jointly acquire land, which is owned in equal thirds. Each brother, however, farms land independently and bears the rental fees and input costs for his operation. Accordingly, crops and expenses are completely separate and distinct to each individual.

Brian testified that he receives benefits from his family which increase the profitability of his farming operation, including: discounted rental rates of $150 to $200 per acre versus the market rate of $300 to $400 per acre on the majority of the land that he rents; the majority of his diesel fuel at no cost to him; and the sharing of equipment, labor, shop space, and various other expenses.

Dori testified that she made the following contributions to Brian's farming operation: Brian would consult her about chemical and herbicide application and general soil welfare; she created plat maps for all of the Osantowski fields to keep field spray records and to help plan for the future; she scouted fields for weed growth; she picked up parts and ran errands; and she went with Brian to check fields, pivots, and lay irrigation pipe. Brian agreed that Dori performed these tasks occasionally, except he explained that the plat maps created by Dori were part of her summer employment and that when Dori would ride with him to the fields, she did so because she enjoyed riding a "four-wheeler" and not because she actually helped with irrigation.

Dori also testified that she performed all of the household duties at her Lincoln residence and that such duties in the Polk County residence were a team effort with Brian.

## 2. EVIDENCE OFFERED AT TRIAL

The parties offered into evidence two versions of a joint property statement, each listing premarital and marital debts and assets. One of the statements was dated May 18, 2015, and the other dated January 9, 2016. Each version listed the

same assets and debts; however, slightly different values were assigned to some. Additional documents were received into evidence to support the property statements, including personal property appraisals from Grubaugh Auction Services, LLC; inventory reports from a certified public accountant; tax returns; settlement sheets from elevators; bank statements; retirement accounts; and balance sheets from several banks, including Great Western Bank.

### (a) Stored and Growing Crops

In regard to the premarital and marital crop inventory, Brian called Michael Hershberger as his expert witness to determine the quantity of stored crops that Brian had on the date of marriage and on the date of separation. Hershberger is a certified public accountant who works with agricultural clients on a regular basis. In reaching his conclusions on these issues, Hershberger relied on Brian's tax returns from 2011 to 2014; the total annual yields in Brian's crop insurance reports, which were reported to him by Brian; two crop sales receipts; and a spreadsheet summary of Brian's recorded crop sales. The spreadsheet summary was prepared by Brian's mother, who does all of Brian's bookkeeping.

On the first day of trial, Hershberger gave testimony regarding his determination of crop inventories and a report he authored was received into evidence. However, that testimony and the exhibit were stricken from the record, because Hershberger had relied on grain elevator receipts which were not provided to Dori through discovery. After Brian supplemented his discovery, Hershberger was again called to testify regarding the crop inventory.

In regard to the premarital crop inventory, Hershberger opined that Brian had a total of 57,156.26 bushels of corn in storage on September 23, 2011, and 91,296.09 bushels of corn and 10,405.99 bushels of soybeans ready for harvest. On September 23, the price at the local elevator was $6.07 for a bushel of corn and $11.57 for a bushel of soybeans. Accordingly, Hershberger concluded that the fair market

value on the date of marriage for Brian's stored crops was $346,938.50 and his unharvested crops were $554,167.27 for corn and $120,397.30 for soybeans, totaling $1,021,503.07. Based on the spreadsheet summary, he also concluded that Brian sold these crops for a total of $1,207,465.53.

Hershberger testified that he believed his estimation of the total bushels of crops produced in 2011 was very accurate, because Brian had claimed on his crop insurance report that a total of 91,863 bushels of corn and 10,151 bushels of soybeans were produced.

In regard to the marital crop inventory, Hershberger concluded that the parties had 95,300.36 bushels of corn in storage on the date of separation and that a bushel of corn sold for $4.66 on that day. Accordingly, he valued the corn in storage on the date of separation as $444,099.68.

However, a balance sheet Brian had submitted to Great Western Bank, dated March 20, 2014, stated that he had 135,000 bushels of corn on hand which had a value of $573,750. Additionally, in Brian's November 2014 response to Dori's interrogatories, he stated that the March 20 balance sheet reflected the quantity and value of the stored crops. In both joint property statements, Dori relied on the March 20 balance sheet for the quantity and value of crops that were marital property.

In the May 2015 joint property statement, Brian failed to list the quantity of crops in storage or assign a value thereto. But in the January 2016 joint property statement, Brian listed 14,862 bushels of corn in storage on the date of separation with a value of $69,257. At trial, Brian testified that his January 2016 estimation of the quantity of corn in storage on the date of separation was based on Hershberger's initial analysis.

Hershberger admitted, however, that his opinions changed dramatically from the first day of trial to the second day of trial. His valuation of the stored crops on the date of separation changed from $69,259.25 to $444,099.68. While his

valuation of the stored and growing crops on the date of marriage changed from $898,603.04 to $1,021,503.07. Hershberger attributed these changes to his mistaken belief that all crops were sold before the next harvest began. But after he requested that Brian's mother identify the year of production for each crop at issue in the sale transactions on the spreadsheet summary, his analysis changed.

### (b) Personal Property and Farm Equipment

Minimal testimony was elicited regarding the parties' premarital and marital personal property and farm equipment. The joint property statements set forth the items, and Brian and Dori generally agreed to them. The values, however, were not agreed upon by the parties. A personal property and equipment appraisal was completed by Grubaugh Auction Services and was received into evidence. The court generally adopted the valuations established in that report.

### (c) Real Estate

In regard to real estate, the record shows that Brian owned four parcels of real estate prior to the marriage as follows: a one-third interest in the "NW¼ [of] Section 8, Township 15 North, Range 1 West[,] Butler County[, Nebraska]" (Bosshart/Gruenwald farm); a one-third interest in the "SW¼W½NW¼ [of] Section 4, Township 15 North, Range 1, Butler County" (Hondorfer farm); a one-third interest in the "W½NE¼ [of] Section 8, Township 16 North[, Butler County]" (Dodendorf farm); and a one-third interest in the "E½SE¼ [of] Section 13, Township 16 North, Range 1, Polk County" (Jahn farm). During the marriage, the parties purchased a one-third interest in the "SW¼ of Section 10, Township 15 North, Range 2 West and the NW¼ of Section 15, Township 15 North, Range 2 West, Polk County" (Roberts farm). Secured debt was owed against each of the properties.

(d) Premarital Debt

In regard to the division of debt, there was no direct evidence of the value of Brian's debts on September 23, 2011. However, Brian annually submitted balance sheets to Great Western Bank that listed his debts and their value on the date of submission. The balance sheets nearest to the date of marriage were dated December 8, 2010, and March 8, 2012. The parties relied on the debts listed on the March 2012 balance sheet in their joint property statements, and the court awarded Brian the six debts listed therein as premarital. The court, however, did not include corresponding values to these debts.

Though the parties listed different amounts for certain debts, the record indicates that the value of the premarital debts awarded to Brian are as follows: Great Western Bank 2010 operating line of credit, $162,000; Great Western Bank loan for a 2008 Mercury Milan, $6,927; Bosshart/Gruenwald farm secured debt, $125,495; Dodendorf farm secured debt, $31,557; "Ag Direct" loan for a Cat Challenger tractor, $49,250; and Hondorfer farm secured debt (Great Western Bank account No. xxx6688), $247,500. The six debts totaled $622,729.

Additionally, the record contains a 2011 "itemized categories report." This report shows that Brian paid $296,046.69 in expenses after the date of the marriage. Brian testified at trial that each of these expenses were incurred for his 2011 crop, which he claimed as a premarital asset, and the court awarded him as such. Accordingly, these expenses were premarital debts.

Therefore, Brian's total premarital debts, as reflected in the record, were approximately $918,775.69.

Dori had a $7,000 debt to her father on the date of the marriage, and she was awarded this premarital debt by the court. The court did not assign a value to this debt, but on the joint property statements, Dori listed its value at $7,000. The record does not reflect any reduction of the debt.

### 3. Trial Court's Decree

In June 2016, the court issued its decree dissolving the parties' marriage and ordering the division of the marital estate. The court determined values for most of the premarital and marital assets it awarded.

The court awarded premarital assets to Dori, with a total value of $20,600, and to Brian, with a total value of $1,139,047. Two of the premarital assets awarded to Brian were the value of his 2010 crops, sold in 2011, and his 2011 crops, sold in 2012, but the court did not assign a value to these assets. It also awarded him the funds present on the date of the marriage in four separate bank accounts.

However, the court found that all of Brian's premarital crops had been liquidated by the date of separation. It also found that Brian deposited the nonmarital proceeds from the liquidated crops into his premarital bank accounts, along with the proceeds from the sale of the marital crops. Accordingly, the court found that these premarital crops and monetary assets were commingled with marital assets. Therefore, it ruled that Brian was not entitled to a setoff from the marital estate for these premarital assets.

The court also rejected Brian's argument that crops should be treated similarly to a herd of cattle—as a single asset for tracing purposes. It reasoned that a herd of cattle is similar to land in that it is a self-sustaining and income producing. Conversely, it stated that crops are an end product that is marketed and liquidated on a short-term basis to pay the expenses of producing it, purchase the seed used for the next crop's production, purchase equipment, and provide the farmer his income for the year. Accordingly, the court did not give Brian a credit for any of the crops in storage on the date of separation; instead, the court awarded Brian all of the crops in storage on the date of separation at a value of $573,750.

The court listed the marital debt it awarded to Dori with a corresponding value of $3,216. While the court also awarded several marital debts to Brian, it did not assign values to all

of them. Nevertheless, the court summarized its award of the marital estate as follows: Brian received $2,517,950 in marital assets and $1,145,294 in marital debt for a total estate of $1,372,656; Dori received $21,611 in marital assets and $3,216 in marital debt for a total estate of $18,395.

Regarding the equity of the distribution, the court found that the marriage was of short duration and that neither party gave up employment or educational opportunities, but that Dori did change her educational program to benefit the marriage. The court rejected Brian's argument that Dori should receive less than one-third of the marital assets. It reasoned that any financial benefit Brian brought to the relationship, above his income, was as the landlord of the premarital property he farmed and that the proper way to account for such a benefit would have been to charge the marriage a cash rent or a crop-share arrangement and segregate it as nonmarital property, of which Brian did not do or provide evidence.

The court ordered Brian to make an equalization payment of $680,000 to Dori, awarding about half of the marital estate to each party.

The court overruled Brian's subsequent motion for new trial or to alter and amend the judgment. Brian appealed.

## II. ASSIGNMENTS OF ERROR

Brian assigns, restated and reordered, that the court erred in (1) failing to set off premarital property awarded to him from the marital estate; (2) failing to set off the value of his premarital stored and growing crops; (3) twice awarding him the same $78,500 as marital property; (4) valuing the crops in storage 2 months prior to separation, when the vast majority of the estate was valued as of the date of separation; (5) making significant mathematical errors in its division of the marital estate; and (6) dividing the marital estate inequitably for a marriage of short duration where the marital estate was almost entirely due to the efforts and premarital contributions of one party.

## III. STANDARD OF REVIEW

[1] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.[1]

[2] In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue.[2] However, when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.[3]

[3] A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.[4]

[4] When reviewing questions of law, an appellate court has an obligation to resolve the questions independently of the conclusion reached by the trial court.[5]

## IV. ANALYSIS

[5,6] Under Nebraska's divorce statutes, "[t]he purpose of a property division is to distribute the marital assets equitably between the parties."[6] The ultimate test in determining the appropriateness of the division of property is fairness and

---

[1] See *Bergmeier v. Bergmeier*, 296 Neb. 440, 894 N.W.2d 266 (2017).

[2] See *id.*

[3] *Id.*

[4] *Id.*

[5] See *White v. White*, 296 Neb. 772, 896 N.W.2d 600 (2017).

[6] Neb. Rev. Stat. § 42-365 (Reissue 2016).

reasonableness as determined by the facts of each case.[7] We have stated that under § 42-365, the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.[8]

### 1. District Court Abused Its Discretion in Failing to Set Off Certain Nonmarital Assets

[7] Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate.[9] Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance.[10] Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists.[11] Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse.[12] If the separate property remains segregated or is traceable into its product, commingling does not occur.[13] The burden of proof rests with the party claiming that property is nonmarital.[14]

Brian contends that the court made several errors regarding its determination of premarital assets. The court awarded

---

[7] *Bergmeier, supra* note 1.

[8] *Id.*

[9] *Id.*

[10] *Sellers v. Sellers*, 294 Neb. 346, 882 N.W.2d 705 (2016).

[11] *Id.*

[12] *Id.*

[13] *Id.*

[14] *Bergmeier, supra* note 1.

Brian the aggregate balance of his four bank accounts on the date of the marriage, which was $182,471. However, it failed to include any credits for that amount. The court awarded Brian the 2010 and 2011 crops, but it did not determine a value for those crops. Brian claims that he used $80,000 from the premarital crops for a downpayment on real estate purchased during the marriage, but that the court did not give him credit for the $80,000.

Brian further contends that based on his testimony and that of Hershberger, he had met his burden to trace the value of his crops on the date of marriage. In the alternative, he asserts that we should treat crops as a single unit for tracing purposes, as the Nebraska Court of Appeals did with livestock in *Shafer v. Shafer*.[15] He asserts that both livestock and crops are biological commodities that are sustained through the reinvestment of the proceeds from their sales and that crops are not self-sustaining merely as a result of the proprietary nature of seeds which producers are contractually obligated to not replant. Accordingly, he asserts that we should deduct the crops he had on the date of marriage from the crops in storage on the date of separation and set it off from the marital estate. Additionally, he argues that the $80,000 downpayment he made on the Roberts farm was traceable to premarital funds.

Dori contends that under our decision in *Brozek v. Brozek*,[16] the court correctly found that Brian was not entitled to a setoff of his premarital crops or the proceeds from those crops and the premarital funds in his accounts because they no longer existed or had been commingled with marital assets at the time of separation. She also argues that Brian is not credible and that therefore, Hershberger's analysis should not be relied on.

---

[15] *Shafer v. Shafer*, 16 Neb. App. 170, 741 N.W.2d 173 (2007), *modified on denial of rehearing* 16 Neb. App. 327, 743 N.W.2d 781 (2008).

[16] *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016).

### (a) Valuing Brian's Premarital
### Stored and Growing Crops

We begin by noting that the court awarded Brian the 2011 stored and growing crops as premarital assets, but did not assign a value to those crops.

In exhibit 37, Hershberger's detailed analysis showed the number of bushels of crops Brian possessed on the date of marriage. While Dori vigorously contested Brian's credibility and Hershberger's reliability, she presented no alternative estimations. Further, Hershberger's estimation of Brian's stored crops and growing crops in 2011 was supported by the crop insurance reports, tax returns, balance sheets, and sales receipts in the record. Exhibit 37 stated the value of Brian's stored and growing crops on the date of marriage was $1,021,503.07.

[8] Appeals in domestic relations matters are heard de novo on the record, and thus, an appellate court is empowered to enter the order which should have been made as reflected by the record.[17] Because the record shows the appropriate non-marital value of these assets, we assign $1,021,503.07 as the value of Brian's premarital stored and growing crops.

### (b) Crops Are Not Similar to
### Livestock for Tracing

In *Sellers v. Sellers*,[18] we adopted the Court of Appeals' reasoning it posited in *Shafer* that a cattle herd owned at the time of the marriage could, based on the totality of the circumstances, be treated as a single asset for tracing purposes and set off from the marital estate as separate property if such a result was equitable.

There, the husband had been engaged in the cattle business throughout the marriage and continually reinvested the proceeds from the sale of cattle into the acquisition of new cattle. We recognized that

---

[17] *Schuman v. Schuman*, 265 Neb. 459, 658 N.W.2d 30 (2003).

[18] *Sellers, supra* note 10.

"one cannot draw a straight line from a cow owned [at the time of the marriage] to a cow owned [at the time of divorce,] which is the prototypical 'tracing' of a premarital asset so as to set it aside to the party who owned it at the time of the marriage."[19]

However, we reasoned that treating a cattle herd as a single asset "'acknowledged the realities of what happens over time in a cattle operation'" rather than "'exalt[ing] form over substance and ignor[ing] the equitable nature of a dissolution action.'"[20]

In *Brozek*, however, we declined to extend this exception to the tracing requirement to premarital machinery because unlike a herd of cattle, which is self-sustaining through reproduction, equipment depreciates in value as it deteriorates and becomes outdated.[21]

We agree with the trial court's reasoning in this case: A herd of cattle is more similar to real property than to personal property. As we stated in *Brozek*, a herd of cattle is generally self-sustaining, through reproduction and reinvestment, and is not subject to depreciation, because it consistently maintains its number- and income-producing capabilities. Crops, on the other hand, are more similar to milk products produced by a herd of dairy cattle. Both are short-term assets that are the product of investing input, maintenance, and equipment costs. They are liquidated on a short-term basis and continuously rolled into production. While a crop cycle is longer and crops may be stored for several years, crops, like milk products, are still end products that account for the income of the individuals raising them.

[9] Brian's argument that crops would be self-sustaining absent contractual requirements to not replant is unavailing. Even if a crop could be used as a source of seed for replanting,

---

[19] *Id.* at 354, 882 N.W.2d at 711, quoting *Shafer, supra* note 15.

[20] *Id.* at 355, 882 N.W.2d at 712, quoting *Shafer, supra* note 15.

[21] *Brozek, supra* note 16.

it would result only in a decrease in the input cost of the production of the short-term asset that is produced through the continued cycle of cultivation and liquidation. Accordingly, we hold that agricultural crops are categorically different in nature from a herd of cattle and, therefore, are not entitled to the same treatment for tracing purposes.

### (c) Brian Is Entitled to Setoff of
### Certain Nonmarital Assets

In *Brozek*, we also considered whether the husband was entitled to a setoff for the balance of his bank accounts and the value of crops he possessed on the date of the marriage. In that case, the parties had been married nearly 20 years and the stored crops at the time of their separation, valued at $1.2 million, were the most substantial asset of the $2.5 million net marital estate. At trial, the husband estimated, through "an armful of exhibits," that the premarital balance of his accounts was $79,000.[22] Additionally, he was not able to show the actual number of crop bushels he harvested the year of the marriage, but, relying on the acres he farmed and the average yield of the area, he estimated the crop's value at $190,000. He claimed that proceeds of the premarital crop were reflected in the current crop, because he continually rolled his proceeds into the subsequent year's expenses.

We held that the husband was not entitled to a setoff from either source of premarital assets, because after 20 years, he could "not identify the different permutations that his premarital property underwent during the marriage."[23] We reasoned that his reinvestment was "mixed with the proceeds of marital harvests and subject to the vicissitudes of the farming economy for nearly 20 years" and that he presented no evidence of the unknown number of deposits and withdrawals from his accounts during the marriage.[24]

---

[22] *Id.* at 698, 874 N.W.2d at 31.

[23] *Id.* at 699, 874 N.W.2d at 31.

[24] *Id.* at 699, 874 N.W.2d at 32.

In *Kalkowski v. Kalkowski*,[25] "we decline[d] to adopt any bright-line rule as to whether or not crops which will eventually generate income may be treated as divisible marital property in a dissolution proceeding." Our analysis considered at the forefront our long-standing principle that the ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case.[26]

There, the parties were married for over 10 years and the wife was the primary caregiver to the four marital children while the husband farmed. The husband argued that his stored and growing crops were inventory, not a traditional asset, because they represented income he had already earned but not realized and income that he had not yet earned. Nevertheless, he included the crops with an assigned value as an asset in the joint property statement and at trial, requested that they be awarded to him. Therefore, we held that the court did not abuse its discretion in including the crops in the marital estate.

[10] Income earned from one or both spouses' employment during a marriage is a marital asset.[27] However, as we recognized in *Kalkowski*, crops are a product of a farming operation that are not income but generate income upon their liquidation. Under this reasoning, crops produced before the marriage and sold during the marriage would generally be considered marital income, but crops produced during the marriage but sold after would not. Accordingly, we allow courts flexibility in their treatment of stored and growing agricultural crops to account for the equities of the situation.

In this case, Brian entered the marriage with a large amount of income from his liquidated crops and unrealized income in the form of growing and stored crops. The court determined

---

[25] *Kalkowski v. Kalkowski*, 258 Neb. 1035, 1042, 607 N.W.2d 517, 524 (2000).

[26] *Id.*

[27] *Davidson v. Davidson*, 254 Neb. 656, 578 N.W.2d 848 (1998).

that this income and unrealized income should not be considered a marital asset because it was fully earned prior to the marriage. On the other hand, the court chose to include the stored crops and proceeds from the sale of crops produced during the marriage in the marital estate but not the crops growing at the time of separation, because the cultivation and risk for these crops remained predominantly with Brian. This decision by the court fairly accounted for the realities of this situation; Brian should not have been punished for holding crops produced and fully grown before the marriage.

The court, however, set off no value from its award of these premarital assets to Brian because it found that the income had been commingled with marital assets. We recognize the law concerning tracing, but we also recognize the overarching principle in the division of marital property is equity, ultimately guided by fairness and reasonableness.

We reject Brian's proposition that providing evidence of the value of growing and stored crops on the date of marriage is sufficient for purposes of tracing; instead, it would simply be a necessary prerequisite for the analysis. Nevertheless, we hold that applying the rigid requirements of tracing in this case would unfairly deprive Brian of his premarital efforts and result in his being double charged in the division of the marital estate by depriving him of his premarital assets and then awarding him the real or personal property in which they were invested.

Hershberger testified that had grain prices not been rising to historic levels, the standard practice would have been for Brian to liquidate his stored crops before the next harvest, which began around the time of the marriage. Further, Brian would likely not have held his 2011 crops through the 2012 harvest when they were no longer traceable.

In *Brozek*, the court included in the marital estate the crops in storage and the balance of the husband's bank accounts, which held the income from crop sales, on the date of the separation. It also included in the marital estate the husband's premarital crops and proceeds therefrom in his bank

accounts. However, this case is distinguishable for a number of reasons.

First, in *Brozek*, the husband could not definitively identify the values of his premarital assets. Just as one could not trace an unknown value of assets, it would be unreasonable to set off a value of assets that is not proved. As mentioned above, Brian clearly established that the value of his stored and growing crops was $1,021,503.07. Further, while Brian did not produce bank statements proving the premarital balance of his accounts, Dori did not contest the values he provided on the second joint property statement. Accordingly, the balance of the accounts, as assigned by the court, was $182,471.

Second, the equities in *Brozek* were vastly different than in this case. In *Brozek*, the estimated value of the premarital assets was less than 10 percent of the net marital estate. Here, the value of Brian's premarital assets was nearly 87 percent of what the court stated was the net marital estate.

Third, the parties in *Brozek* had been married nearly 20 years. Brian and Dori's marriage, on the other hand, lasted only 31 months, spanning only 2 full crop cycles. Through the course of a long-term marriage, proceeds reinvested in crops are subject to the vicissitudes of the market, equipment purchased with such proceeds deteriorates and is replaced with equipment purchased through solely marital funds, and the equity of commingling funds becomes less severe. In light of the short-term marriage here, it would be inequitable to allow Dori to benefit from an increase to the marital estate of over $1.2 million in assets because of Brian's inability to trace them.

Accordingly, based on the equities of the situation in this case, the court's failure to set off the value of Brian's premarital bank accounts and crops placed Brian at a vast disadvantage in the division of marital property. Therefore, fairness and reasonableness require a determination that the court abused its discretion in not setting off $1,203,974.07 from the marital estate.

## 2. Valuation and Distribution of Marital Assets

### (a) Trial Court Abused Its Discretion by Double Counting Assets

Brian argues that the court double counted assets by awarding him check No. 1718, for $78,500, and the 2011 John Deere tractor model 9630T without deducting the downpayment on the tractor as evidenced by check No. 1718.

In exhibit 20, Dori listed the checks and their values that she argued were prepayments for farming expenses associated with the 2014 crop that Brian paid with marital funds before the separation. She did not claim any interest in the 2014 crops but argued that the prepayments with marital assets should be considered marital property. Included in the exhibit 20 list was check No. 1718 for $78,500, which was dated February 3, 2014. At trial, however, both parties testified that check No. 1718 was used as a downpayment for the 2011 John Deere tractor.

In its decree, the court awarded Brian all of the prepaid farm expenses listed in exhibit 20 as marital assets, including check No. 1718 with the value of $78,500. The court also awarded Brian the 2011 John Deere tractor model 9630T, at a value of $140,000, which represented its fair market value of $205,000 minus the premarital value of a Cat Challenger tractor that was sold for $65,000 and used toward its purchase.

The court's failure to deduct the $78,500 prepayment on the 2011 John Deere tractor model 9630T from the tractor's value resulted in an increase to Brian's net marital estate of $78,500. Accordingly, the court abused its discretion in substantially increasing the value of the marital estate it awarded to Brian.

### (b) Court Abused Its Discretion by Valuing Crops in Storage as of March 20, 2014

Brian contends that the court erred in accepting Dori's value of the stored crops that relied on his March 20, 2014, balance

sheet. He argues this valuation is inequitable, because it represents the quantity of stored crops and the price per bushel on March 20, 2014, rather than the actual date of separation over 2 months later. Accordingly, he argues that the quantity and value of crops in storage should be valued at $444,099.68, because the evidence shows that he had only 95,300.36 bushels of corn on May 31, 2014, and the price per bushel of corn on that day was $4.66.

Dori contends that the quantity and valuation of the parties' stored crops is a disputed factual matter and that we should defer to the trial court's decision, because it had the opportunity to evaluate the credibility of the witnesses. She contends that unlike Brian and his expert, Hershberger, she has consistently maintained her opinion that the stored crop's marital value was $573,750, which the court accepted.

[11] As a general principle, the date upon which a marital estate is valued should be rationally related to the property composing the marital estate. The date of valuation is reviewed for an abuse of the trial court's discretion.[28]

As discussed in the background section, the parties spent a considerable period of time at trial contesting the quantity and value of corn that the parties owned at the time of separation. Hershberger testified that his determination in exhibit 37 of the quantity of corn in storage was based on Brian's or Brian's mother's determination as to what year of crops were reflected in the sales receipts in the fall of 2014. He also testified that if the information he was provided was inaccurate, then so was exhibit 37. Exhibit 37 is the final valuation that Brian relied upon and what he argues we should find the value as on appeal.

Exhibit 37 shows that the bushels of corn the parties owned on March 20, 2014, was 142,040.44. Hershberger's report showed the bushels of corn the parties owned on May 31, 2014, was 95,300.36. The record also contains five sales

---

[28] *Stanosheck v. Jeanette*, 294 Neb. 138, 881 N.W.2d 599 (2016).

receipts which show the quantity of stored crops decreased between March 20 and May 31, 2014, by 46,740.08 bushels as a result of Brian's selling the grain. In addition, the record contains deposit slips showing that the proceeds from each of the five sales were deposited into Brian's farm checking account between April 8 and May 12, 2014. The value of Brian's farm checking account was determined as of May 31, 2014.

The court's reliance on the corn values as of March 20, 2014, and its reliance on the bank account balance as of May 31, 2014, creates a double counting of the corn's value. Accordingly, the court abused its discretion in disregarding this evidence and relying on the March 20, 2014, balance sheet alone, because it resulted in a valuation that was not rationally related to the property composing the marital estate. Therefore, the value of crops in storage on the date of separation awarded to Brian is $444,099.68.

### (c) Errors Argued But Not Assigned

Dori contends that on the date of separation, Brian had 45,024.032 bushels of corn stored at Husker Coop, with a value of $209,811.93, which was not included in the court's award. Her argument is based on an August 23, 2013, settlement sheet from Husker Coop, which shows that Brian had 70,024.02 bushels of corn stored there and that he sold 25,000 bushels of the stored corn. She argues that there is no record of this remaining corn being sold and that it is not accounted for on Brian's March 20, 2014, balance sheet.

Brian argues that the court incorrectly added the value of the bank accounts it awarded to Dori as marital property. If Brian were correct, the court's mistake would constitute plain error.[29] His argument, however, is more properly characterized as asserting that the court incorrectly valued the marital assets in Dori's First National Bank savings account

---

[29] See *Clason v. Clason*, No. A-15-626, 2016 WL 6210946 (Neb. App. Oct. 25, 2016) (selected for posting to court website).

No. xxx632 by relying on the value listed in the first joint property statement, $500, rather than the second joint property statement, $4,627.

[12] Absent plain error, errors argued but not assigned will not be considered on appeal.[30] The court's findings and its award concerning both the crops in storage on the date of separation and account No. xxx632 were supported by evidence presented to the court. Therefore, we do not consider either parties' argument.

### 3. PLAIN ERROR COMMITTED BY COURT

[13,14] Plain error exists where there is an error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process.[31] Plain error may be asserted for the first time on appeal or be noted by an appellate court on its own motion.[32]

### (a) Trial Court Erred in Valuing Marital Debt on Roberts Farm

In its decree, the court explained that Brian had listed secured debt on the real estate, including the Bosshart/ Gruenwald farm, the Dodendorf farm, and the Roberts farm, in the amount of $1,063,797. As a result, the court calculated the value of the secured marital debt on the Roberts farm by deducting the value of Brian's premarital debt on the Bosshart/ Gruenwald farm and the Dodendorf farm on the date of the marriage from the total stated amount. After making the deduction, it determined that the marital debt secured by real estate was $894,081.

---

[30] *Hike v. State*, 297 Neb. 212, 899 N.W.2d 614 (2017).

[31] *State v. Robbins*, 297 Neb. 503, 900 N.W.2d 745 (2017).

[32] *Id.*

However, in the January 2016 joint property statement, both parties listed the amount of the debt on the Roberts farm to be $871,297, which is the amount stated in the March 20, 2014, balance sheet. Accordingly, the court mistakenly valued the Roberts farm debt to be $22,784 more than it actually was.

The court's valuation of the Roberts farm was not based on the evidence and resulted in Brian's being awarded an additional $22,784 in marital debt. In doing so, the court committed plain error in this valuation.

Since we give Brian credit for his premarital crop inventory, his argument that he used $80,000 from the premarital crops for a downpayment on the Roberts farm is without merit.

### (b) Court Failed to Set Off Brian's Premarital Dodendorf Farm Debt From Marital Estate

The court awarded Brian the debt owed on the Dodendorf farm as a marital debt but did not assign a value. The parties agreed in both joint property statements that the value of this debt at the time of separation was $17,451. Under Dori's valuation of the debt, however, she stated on both joint property statements that the debt was premarital, and Brian did the same on the second joint property statement. This debt is listed in Brian's February 18, 2010, balance sheet, and the court awarded the Dodendorf farm to Brian as a premarital asset.

In awarding Brian the debt on the Dodendorf farm as a marital debt, it committed plain error in failing to set off the debt as premarital in the amount of $17,451.

### (c) Trial Court Failed to Value and Award Certain Marital Assets and Debts

As mentioned above, under § 42-365, a court has a duty to value and divide all of the assets and debts constituting the marital estate. In this case, the court's failure to do so in the following instances significantly affected the valuation and equitable distribution of the marital estate.

As mentioned above, because appeals in domestic relations matters are heard de novo on the record, an appellate court is empowered to enter the order which should have been made as reflected by the record.[33] In each of the following instances, the court's findings and the record provide a sufficient basis to value and award the assets and debts.

### (i) Marital Property That Should Have Been Awarded to Brian as Assets

Both joint property statements and both of the personal property and equipment appraisals from Grubaugh Auction Services contain the following items of property: "2012 Brandt Grain Deck," "2010 Polaris 550 ATV," a one-third interest in two pivots (Roberts farm), a one-third interest in the Hondorfer farm well pump, a 48-foot grain bin, and a 24-foot enclosed car trailer. Brian valued these items at a combined total of $25,900, and Dori valued them at a combined total of $78,010. At trial, Brian testified that his valuations were based on the appraisals from Grubaugh Auction Services, and Dori testified that her valuations were based on the depreciation schedules from Brian's tax returns or the May 20, 2014, balance sheet.

The court awarded Brian "[a]ny property not specifically listed, but in [his] possession." Further, the court relied on the Grubaugh Auction Services appraisals over Brian's depreciation schedule for valuing all of the items it valued. Dori did not assign error to the court's reliance on those appraisals, so we will defer to the court's judgment on that issue.

Accordingly, we award these remaining assets to Brian and find their value as follows: "2012 Brandt Grain Deck," $10,500; "2010 Polaris 550 ATV," $3,500; a one-third interest in two pivots (Roberts farm), $2,000; a one-third interest in the Hondorfer farm well pump, $4,000; a 48-foot grain bin, $1,500; and a 24-foot enclosed car trailer, $4,400.

---

[33] *Schuman, supra* note 17.

### (ii) Value of Marital Debts
### Awarded to Brian

When listing the unsecured marital debts that were awarded to Brian, the court provided no corresponding values. It summarized the total marital debts awarded to Brian as $1,145,294. We can find no combination of debts in the record that total this amount.

The value of the following debts awarded to Brian were undisputed: Roberts Farm, $871,297; "Ag Direct" loan for the Cat Challenger tractor, $30,548; "John Deere Financial," $183,000; and "Chase Auto Finance," $30,785. As a result, we determine the amount of debt awarded to Brian to be $1,115,630.

However, other debts were inconsistently listed on the joint property statements or the evidence varied as to the amounts owed, including the Great Western Bank operating line of credit, a Sears credit card debt, and a Cabela's credit card debt.

At trial, the president of Great Western Bank and Brian's primary lender testified that the March 20, 2014, balance sheet accurately stated that Brian owed $1,486 on the operating line of credit on that date but that it had no balance owed on the date of separation. Dori did not challenge this witness' credibility, and the court made no finding that he was not credible.

In regard to the Sears and Cabela's credit cards, Dori introduced evidence to show that both debts were paid in full on the date of separation.

Brian also claimed for the first time on the second joint property statement that he had a marital debt from unpaid property taxes. Under the title of the debt, Brian listed the four properties, presumably, from which the taxes were owed. One of these was the Roberts farm, but the others were premarital properties. Real estate taxes on nonmarital property are nonmarital debts.[34] Brian did not submit any supporting evidence

---

[34] 2 Brett R. Turner, Equitable Distribution of Property § 6:97 (3d ed. 2005 & Supp. 2016-17).

of this claim or of the value attributable to the Roberts farm. The court did not award or value this debt.

Based on the record, we conclude that there was no debt owed on the Sears and Cabela's credit cards or the Great Western Bank operating line of credit on the date of separation. We also conclude that Brian failed to submit sufficient evidence to show how much, if any, unpaid taxes he owed on the Roberts farm; accordingly, the court did not err in failing to assign it.

### (iii) Brian Should Have Been Awarded Value of Reduction in His Premarital Debts as Asset

[15] "[A] non-owning spouse is entitled to some benefit when marital funds have been expended to improve or reduce the debt on the other spouse's nonmarital property."[35] As discussed above, Brian had $918,775.69 in premarital debts between loans on his nonmarital property and expenses incurred in the production of his 2011 crop. According to Brian's premarital debts listed on the March 20, 2014, balance sheet, only $209,951 of these debts existed on the date of separation. As a result, Brian's premarital debts were reduced, during the marriage, by approximately $708,824.69. In light of the fact that we set off the premarital value of Brian's bank accounts and stored and growing crop inventory, it would be inequitable to not also include in the marital estate this benefit conferred to Brian. Accordingly, we award Brian the value of his premarital debts reduced with marital funds.

### 4. Division and Valuation of Marital Property

Brian argues that the court committed mathematical errors in totaling the parties' assets and debts, which created errors in the equalization payment it ordered. After reviewing the

---

[35] *Jones v. Jones*, 2014 Ark. 96, at 5, 432 S.W.3d 36, 40 (Feb. 27, 2014). Accord 24 Am. Jur. 2d *Divorce and Separation* § 486 (2008). See, also, *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004).

order, we agree that the court committed an abuse of discretion by incorrectly totaling the values of its award and relying on those values to calculate the marital estate and equalization payment.

Having resolved Brian's assignments of error and noticing plain error on the division of the marital estate, we provide the following division of debts and assets of the parties:

| Item | Brian | Dori |
|---|---|---|
| Bank Accounts | $ 218,120.00 | $ 5,272.00 |
| Real Estate | 981,333.00 | 0.00 |
| Vehicles | 59,500.00 | 17,500.00 |
| Farm Equipment | 280,701.00 | 0.00 |
| Crop Inventory | 444,099.68 | 0.00 |
| Prepaid Farm Expenses | 164,643.00 | 0.00 |
| 401K | 0.00 | 1,739.00 |
| Household Goods & Furnishings | 5,200.00 | 0.00 |
| Reduction in Premarital Debt | 708,824.69 | 0.00 |
| Debt | (1,115,630.00) | (3,216.00) |
| Premarital Crop Inventory | (1,021,503.07) | (0.00) |
| Premarital Bank Accounts | (182,471.00) | (0.00) |
| TOTAL | $ 542,817.30 | $21,295.00 |

Based on the balance sheet above, the total value of the marital estate is $564,112.30. The value of the marital estate awarded to Brian is $542,817.30, and the value awarded to Dori is $21,295. An equal distribution would require a payment from Brian to Dori in the amount of $260,761.15.

### 5. Division of Marital Estate

Brian contends that the court's equal distribution of the marital estate is inequitable based on our principles for distributing the marital estate. Additionally, Brian argues that we should award Dori less than the standard 33 to 50 percent of the marital estate, under *Davidson v. Davidson*.[36] He argues this case is factually analogous to *Davidson*, except the wife in *Davidson* abandoned a promising career for the marriage,

---

[36] *Davidson, supra* note 27.

while Dori did not forgo any opportunities. Further, he asserts that the division does not provide him a means to pay the award, because it will likely put him out of business.

Dori contends that the court's distribution was warranted because both parties worked hard during the marriage and she changed her field of study and college for her doctoral program to benefit the marriage. She argues that the unique circumstances in *Davidson* are not applicable here, because Brian had been farming only a short time before the marriage and held no stock options or retention shares. Further, she asserts that there is no evidence to support Brian's claim that he cannot make the equalization payment, because at the time of separation, he had little short-term debt and significant liquid assets and had prepaid many of his 2014 farm expenses.

[16-18] In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment.[37] In addition to the specific criteria listed in § 42-365, in dividing property and considering alimony upon a dissolution of marriage, a court should consider the income and earning capacity of each party and the general equities of the situation.[38] As a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case.[39]

In *Davidson*, the marital estate was valued at $7,886,119, of which the husband's employee stock options and stock retention shares alone accounted for $5,655,974.[40] At the time of the

---

[37] *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015).

[38] *Id.*

[39] See *Lorenzen v. Lorenzen*, 294 Neb. 204, 883 N.W.2d 292 (2016), citing *Millatmal v. Millatmal*, 272 Neb. 452, 723 N.W.2d 79 (2006).

[40] *Davidson, supra* note 27.

marriage, the husband was Union Pacific Railroad's president and chairman. About 1 year into the marriage, he was named president of the Union Pacific Corporation, and about 2 years into the marriage, he was promoted to chief operating officer of that same corporation. We acknowledged that the bulk of the marital estate consisted of stock options and retention shares that were earned as a result of those promotions.

In considering the equitable division of the estate, we noted that the husband's "33-year career in the railroad industry had reached its zenith at the time the parties were married" and that he had been receiving stock options and retention annually for the 10 years preceding the marriage.[41] We also noted that the wife provided social support, tutored the husband's college-age son, and interrupted a successful career for the marriage. On the other hand, the husband's nonmarital children did not reside permanently with the parties and the wife was able to finish her Ph.D. during the marriage. Further, we reasoned:

> Considering that no children were born to the parties, that the parties separated after 2 years, that the marriage lasted 38 months, that [the husband's] career was well established, and that [the wife] is highly educated and capable of finding employment, we conclude that the trial court's adherence to the general guidelines was an abuse of discretion.[42]

Accordingly, based on the circumstances of the case, which we stated were "unique," we reversed the court's order granting the wife 33 percent of the marital estate and held that the wife was entitled to only $950,000, or about 12 percent of the marital estate.[43]

In the instant case, we reject Brian's argument that the circumstances warrant deviating from our general rule for

---

[41] *Id.* at 670, 578 N.W.2d at 859.

[42] *Id.* at 671, 578 N.W.2d at 859.

[43] *Id.* at 672, 578 N.W.2d at 860.

dividing the marital estate. While some of the factors for dividing the marital estate in this case are similar to those in *Davidson*, the unique circumstances in *Davidson* that warranted the deviation is not.

The facts in *Davidson* were unique because the husband's career reached its zenith at the same time that the parties married. As a result of the husband's career-long efforts, he was twice promoted during the short-term marriage, which resulted in his receiving employee stock options and stock retention shares far in excess of his regular salary. While we accounted for the portion of the option and shares that were nonmarital, the remaining value had still resulted substantially from his premarital efforts and the husband had no ability to prevent these assets from becoming marital as they were income from employment.

Because we decided that Brian was entitled to a setoff of his premarital assets above, there is nothing in this case that approaches the inequity we found in *Davidson*.

Admittedly, the following factors in this case are similar to those in *Davidson*: the marriage was short term, no children were born of the marriage, Brian contributed a disproportionate amount of finances to the estate, Dori received a professional doctoral degree during the marriage, and both parties are well situated to engage in gainful employment. Also, unlike in *Davidson*, Dori did not forgo any employment opportunities, and, while she changed her educational plans, Dori received a comparable education to what she would have in South Dakota.

While these factors may support awarding Dori only 33 percent of the marital estate, as the lower court in *Davidson* had, the circumstances of the parties and their contributions to the marriage support a more equal distribution.

In *Davidson*, the wife made little contribution to the marriage, financially or through other efforts, which we described as occasional tutoring of the husband's son and volunteer work.

Here, Dori worked full time during her breaks from school and after graduation, and she received financial support from

her scholarship for living expenses. While she earned less than Brian, she bore most of the costs of the apartment in Lincoln, her living expenses in Lincoln, and her travel expenses. Brian, on the other hand, lived in a house provided by his parents and provided no evidence of expenses outside of his farming operation. Brian provided little financial support to Dori during the marriage, which prevented her from accruing savings or other assets.

Further, while her education was comparable to what she would have received, she changed her field of study to enable her to contribute to the farming operation. While her contributions to the farming operation during the marriage were minimal, what she did contribute was based primarily on knowledge she obtained from her studies, which showed the utility of the educational decisions she made.

Additionally, Dori bore the majority of the burden of travel during the marriage to allow the parties to see each other. During the portion of the marriage when Dori resided in Lincoln, she still traveled to the Polk County residence 3 or 4 days a week. During the other portion of the marriage when Dori resided in Polk County, she commuted to Lincoln for school and her full-time summer employment. Brian traveled to Lincoln frequently during the first winter of the marriage but carried little of the burden thereafter. Further, Dori was solely responsible for maintaining her Lincoln residence and also put in considerable efforts at the Polk County residence. Brian testified that she would provide extra assistance at the Polk County residence during his busy season, which allowed him to focus on his farming operation.

While reasonable minds could differ as to what the appropriate distribution of the marital estate within the general range should have been in this case, an abuse of discretion is a highly deferential standard of review. Our opinion, based on an independent review of the record, supplants the court's decision only in the instance where its decision was untenable. Brian contributed more financially to the marital estate, but Dori also earned income throughout the marriage and was responsible

for much of the expenses. She also bore a disproportionate amount of homemaking duties and the burden to ensure she and Brian could spend time together regularly during the marriage. Finally, as the trial court reasoned, Brian had the opportunity to keep his family gifts and nonmarital property contributions, which contributed heavily to his earnings, separate from the estate, but did not. Accordingly, we cannot say that the decision by the district court was unreasonable or unfair.

Brian presented no evidence to support his claim that the equalization payment would threaten the continuation of his business. He was awarded substantial cash assets, prepaid farming expenses for 2014, and the crops produced that year, the expenses of which would likely have been paid in the prior year when they were produced. Accordingly, we find no merit to his claim that requiring him to make an equalization payment was unfair.

## V. CONCLUSION

We affirm the court's decision that stored and growing crops should not be treated the same as cattle herds for tracing purposes, but we hold that the court committed an abuse of discretion and plain error in its distribution of nonmarital and marital assets and debts. Notably, based on the circumstances of this case, we find that the court erred in not setting off the value of Brian's stored and growing crops on the date of marriage and not assigning a credit to the marital estate for the substantial amount of Brian's premarital debts that were reduced during the marriage.

Further, we hold that the court did not abuse its discretion in awarding Dori one-half of the marital estate. In light of our holdings above, we modify the court's order consistent with this opinion and order Brian to make an equalization payment of $260,761.15.

AFFIRMED AS MODIFIED.

WRIGHT, J., not participating in the decision.