Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/10/2019 09:06 AM CDT

Brandi J. Anderson, appellee and cross-appellant,
v. Donald J. Anderson, appellant
and cross-appellee.

___ N.W.2d ___

Filed September 3, 2019.    No. A-18-754.

1.  **Divorce: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge.

2.  **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.

3.  **Evidence: Appeal and Error.** In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue.

4.  ____: ____. When evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another.

5.  **Divorce: Attorney Fees: Appeal and Error.** In an action involving a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion.

6.  **Divorce: Property Division.** Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.

7. ____: ____. The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case.

8. ____: ____. As a general rule, all property accumulated and acquired by either party during the marriage is part of the marital estate, unless it falls within an exception to the general rule.

9. ____: ____. Exceptions to the rule that all property accumulated and acquired during the marriage is marital property include property accumulated and acquired through gift or inheritance.

10. **Divorce: Property Division: Proof.** The burden of proof to show that property is nonmarital remains with the person making the claim.

11. **Divorce: Property Division.** As a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case.

12. **Divorce: Property Division: Words and Phrases.** "Dissipation of marital assets" is defined as one spouse's use of marital property for a selfish purpose unrelated to the marriage at the time when the marriage is undergoing an irretrievable breakdown.

13. **Divorce: Property Division.** Marital assets dissipated by a spouse for purposes unrelated to the marriage should be included in the marital estate in dissolution actions.

14. ____: ____. Debts, like property, ought to also be considered in dividing marital property upon dissolution.

15. ____: ____. When one party's nonmarital debt is repaid with marital funds, the value of the debt repayments ought to reduce that party's property award upon dissolution.

16. **Child Support: Evidence.** Generally, earning capacity should be used to determine a child support obligation only when there is evidence that the parent can realize that capacity through reasonable efforts.

17. **Divorce: Property Division: Alimony.** In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the custody of each party.

18. ____: ____: ____. In addition to the specific criteria listed in Neb. Rev. Stat. § 42-365 (Reissue 2016), in dividing property and considering alimony upon a dissolution of marriage, a court should consider the income and earning capacity of each party and the general equities of the situation.

19. **Alimony: Appeal and Error.** In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. The ultimate criterion is one of reasonableness.

20. ____: ____. An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record.

21. **Visitation.** The trial court has discretion to set a reasonable parenting time schedule.

22. ____. A reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent, and the determination of reasonableness is to be made on a case-by-case basis.

23. ____. Parenting time relates to continuing and fostering the normal parental relationship of the noncustodial parent.

24. ____. The best interests of the children are the primary and paramount considerations in determining and modifying visitation rights.

25. **Attorney Fees.** Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees.

26. **Divorce: Attorney Fees.** A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases.

27. ____: ____. Attorney fees and costs are often awarded to prevailing parties in dissolution cases as a matter of custom.

28. ____: ____. In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services.

29. **Attorney Fees: Affidavits: Evidence.** Where a party seeks to recover attorney fees, the best practice will always be to provide an affidavit or other evidence such as testimony or exhibits. Litigants who do not file such an affidavit or present other evidence risk the loss of attorney fees because of the difficulty of discerning such information from the record alone.

Appeal from the District Court for Hall County: MARK J. YOUNG, Judge. Affirmed as modified.

Mark Porto, of Porto Law Office, for appellant.

Nicholas D. Valle, of Langvardt, Valle & James, P.C., L.L.O., for appellee.

Riedmann, Arterburn, and Welch, Judges.

Arterburn, Judge.

## I. INTRODUCTION

Donald J. Anderson appeals from the decree of dissolution entered in the district court for Hall County, which dissolved his marriage to Brandi J. Anderson. On appeal, Donald challenges the court's property distribution and the calculations of his child support and alimony obligations. On cross-appeal, Brandi challenges the court's visitation schedule, alimony award, and attorney fees determination. For the reasons that follow, we affirm the decision of the district court as to child support, alimony, the visitation schedule, and attorney fees. We modify in part the district court's decision as to property division.

## II. BACKGROUND

Donald and Brandi were married on September 25, 1999, and had three children together: a son, S.A., born in 2006; a daughter born in 2008; and a son born in 2015. After nearly 17 years of marriage, the parties separated in July 2016, and Brandi filed an amended complaint for dissolution of marriage on August 15.

After a hearing on October 14, 2016, the court entered temporary orders that found the children's need for a "significant amount of stability in their lives" made it inappropriate for the court to order joint custody with weekly transitions. Thus, the court gave Brandi temporary legal and physical custody of the children and allowed Donald to have parenting time every other weekend from Friday at 5 p.m. until Sunday at 7 p.m. During the weeks when Donald did not have weekend parenting time, he had 2 hours of parenting time with S.A. and his sister, individually, on one weeknight each. The parties subsequently agreed that Donald's weekend parenting time would

begin on Thursdays instead of Fridays. They also agreed that Donald would have parenting time with all the children on Thursday evenings during weeks when he did not have weekend parenting time. The court also ordered Donald to pay temporary child support of $1,251 per month and temporary spousal support of $1,100 per month.

Trial was held on February 1 and 13, 2018. At trial, Brandi testified that she had obtained a student loan prior to the marriage, a portion of which was repaid during the marriage. In November 2017, the principal balance was $21,785, while interest payments totaled over $31,897 during the loan's lifetime, which began in 1990. The loan financed Brandi's education, which enabled her to become a licensed teacher. Brandi worked as a schoolteacher from the time the parties married in 1999 until 2006, when S.A. was born. When S.A. was born, Brandi quit teaching and began caring for him full time. She testified that no daycare would accept him, because he rarely slept as an infant and cried, screamed, and needed to be rocked nearly constantly for several years. S.A. was later diagnosed with Asperger's syndrome (Asperger's).

S.A. developed violent tendencies and was prone to outbursts if unexpected or unplanned events occurred. Brandi testified that inconsistency in rules and consequences oftentimes led to S.A.'s bad behavior. Jealousy and seeing his siblings receive attention also led to S.A.'s outbursts. S.A. experienced suicidal thoughts, and in April 2017, he began talking about suicide in more detail and began acting out a plan to commit suicide. Brandi admitted S.A. to a hospital at that time.

Brandi offered testimony from a licensed independent mental health practitioner, Joan Schwan, who counseled S.A. from October 2016 through January 2018. Schwan also met the other children briefly. Schwan testified that because S.A. has Asperger's, he needs a calm, structured living environment. She worked with him to process his feelings and handle anger. Schwan said that S.A. needs consistency across both parents' homes and that it was detrimental for him to

view visitations with Donald as more fun because it was just the two of them. After a 5-day visit with Donald, S.A. told Schwan that he had not taken his medications and showered only once during that time. She knew that S.A. had "blow-ups" and "meltdowns" during which he would scream, kick, and hit others, particularly after spending one-on-one visitations with Donald.

Schwan opined that one-on-one visitations were not appropriate for S.A., because he viewed the individual attention as indicating that he was more special than his siblings. Schwan described that S.A. demands increasing amounts of his parents' attention, especially once they respond by giving him attention. Schwan said that because of that attention-seeking cycle, one-on-one visitations may be appropriate for other children but were not appropriate for S.A., because "he plays it" and sees the additional attention as indicating that he is special, which leads to him demanding more time. She testified that it was important for S.A. to see Donald giving time to S.A.'s siblings and to "actually witness that [his sister] is just as important as he is." She testified that her understanding was that S.A. would return from one-on-one visitations with Donald and brag and bully his sister about it. Schwan said that S.A.'s attitude similarly affects his schoolwork and recalled an instance of S.A.'s calling a classmate "a jerk because he wasn't getting his way immediately." Brandi also testified that S.A. returned from visitations with Donald and taunted his siblings but that S.A.'s behavior was much better when he returns from visitations that all the children attend.

Brandi described S.A.'s need for consistent routines and said that he "holds it all together during the school day" but can become volatile for a few hours after school until he gets into a routine again. However, she testified that S.A. does very well in school and had not had any disciplinary problems in school for the past 2 years. Her opposition to individual parenting time with Donald was based on her concern for the number of transfers and disruptions to their routine that

it caused. Brandi testified that she did not want to keep the children from Donald. Donald similarly testified that S.A. does "great in school" and had no more behavioral problems than any other student. Donald said that individual parenting time with S.A. was important to him in order to enjoy quality time together and described that the youngest child requires most of his attention when all the children are together.

Beginning in 2006, when S.A. was born, Donald was the family's sole income earner. Donald worked as a business development manager at a construction company from sometime before the parties were married through 2003. He then worked briefly as a personal banker before beginning to work at Credit Management Services, Inc. (Credit Management), in 2005. Donald left Credit Management in 2013 after having difficulties with his boss and because he was traveling for 7 to 10 nights each month. When he left Credit Management in 2013, he was making an estimated $112,000 per year. From October 2013 through June 2014, Donald worked for an insurance company, earning commission only. He testified that the job required extensive travel and staying in hotels a minimum of three nights per week. Donald began working for Axis Capital, Inc., in 2014, earning a base salary of $45,000 plus commission. When he was promoted in 2015, his base salary was raised to $70,000 plus commission. Tax documents show that the couple earned $132,200 in wages during 2015, the vast majority of which came from Donald's work at Axis Capital. In 2016, after disclosing an affair with a colleague, Donald was demoted and his pay was reduced by $2,000 per month. Donald then left his job with Axis Capital at the end of July, having earned $98,000 from January through July 2016.

Donald then worked for another construction company for 2 months, where his annualized salary was approximately $81,000 before commission. In October 2016, he began working for Providence Capital, which paid him approximately $6,000 per month plus commission during a 120-day probationary

period. He resigned from Providence Capital in February 2017 and returned to Credit Management from March through May 2017. At that time, Credit Management paid Donald an annual salary of $50,000 plus commission, which he said "wasn't significant." His territory included western Nebraska and eastern Kansas, which he said was not conducive to visitations with his children, because the divorce proceedings had begun by that time. When he left Credit Management in May 2017, he started his own firm, while also "actively seeking" other employment. He testified that he made approximately $4,400 through that venture.

In September 2017, Donald began working for Hamilton Telecommunications and remained employed there at the time of trial. Hamilton Telecommunications paid Donald an initial base salary of $55,000 per year plus commission. His base salary would decrease by $5,000 per year as commissions built up, eventually bottoming out at a $35,000 minimum. His salary was projected to grow significantly year to year if he met his sales goals.

In 2007, Donald and Brandi purchased a home together in Grand Island, Nebraska, for $145,000. They added a bedroom and remodeled the master bathroom. Brandi testified that at the time of trial, the home's roof was in "horrible shape" and needed repairs because the area around the chimney leaked when it rained. She said that roof repairs were estimated to cost $12,500. Brandi also testified that the windows were caving in, needed to be propped up, and let cold air blow inside. Brandi offered testimony from a real estate appraiser, who valued the home at $150,000. He testified that his appraisal accounted for the renovations and additions to the home. He also testified that, traditionally, a county assessor's appraisal is supposed to be within 3 to 5 percent of a home's full value and that county assessors do not individually appraise homes and do not make physical inspections of every home.

When the parties refinanced their home mortgage in 2012, an appraisal was required, which valued the home at

$160,000. In 2017, the Hall County assessor valued the home for tax purposes at $171,449. At trial, Donald testified that he believed an accurate valuation of their home was $185,000, which he calculated by assuming that the tax-assessed value was 92 percent of the home's actual value. Donald took issue with the valuation offered by Brandi's expert, because he believed that the expert's appraisal did not accurately reflect the home's square footage, number of rooms, or age and that the homes used for comparison's sake were substantially different. The appraiser, when asked about his report's inaccuracies, said that the errors did not affect his valuation, because his ultimate opinion was based on his physical inspection of the property.

Donald testified that he and Brandi withdrew $20,000 from his Credit Management retirement account in 2008 or 2009 and used some of the funds to repay their home loan. They repaid the withdrawal before Donald's employment with Credit Management ended. He said that the funds were used for home renovations and household items, while also acknowledging that some of the withdrawn funds were used to pay down gambling debts he incurred, but he did not estimate the amount.

In 2014, the parties withdrew approximately $60,000 from retirement accounts to offset decreased income, and Donald acknowledged that "a few thousand dollars" went toward gambling debt. Brandi stated that $2,000 of a $12,000 withdrawal in 2014 was never accounted for and that she assumed it was for gambling, because "[t]hat's his pattern." Donald acknowledged that he spent $570 on gambling in February 2017 and $1,762 on gambling in April 2017 after the parties' separation. Brandi testified that Donald's gambling was an issue throughout their marriage, because they had lost "thousands." She acknowledged that Donald sought help for gambling and secured a church friend to act as his "accountability partner," who met with Donald and went with him "to [his] bookie to cut ties" with him.

Donald also described withdrawing $12,000 from retirement accounts during the summer of 2017 pursuant to an agreement with Brandi. He used the money to catch up on child support, spousal support, and health care payments.

During the marriage, Brandi's grandmother made a number of gifts by checks that were made out to both Donald and her and some made to her alone. Brandi calculated the total of the checks made out to Donald and her jointly as $3,750, while the checks to her alone totaled $20,900. Brandi also acknowledged that Donald's parents gave them approximately $5,000 when they bought their first home.

Brandi testified that her grandmother died "about a week after [Donald] moved out of the house" and that she inherited $7,000 from her grandmother. Shortly thereafter, Brandi's father, who was the personal representative of her grandmother's estate, made gifts to a number of the heirs, including Brandi. Brandi said that the total amount she received was "[r]oughly lower 30's, 30 some thousand."

On July 6, 2018, the court entered a decree dissolving the marriage between Donald and Brandi. The court awarded legal and physical custody of the children to Brandi based on "the difficulties the parties have in communicating and the need for stability of the children (particularly [S.A.])." The court awarded Donald parenting time every other weekend from 5:30 p.m. on Thursdays until 7 p.m. on Sundays. Additionally, on the weeks when Donald did not have weekend parenting time, the court awarded him parenting time with the younger son for 1½ hours on Mondays, with S.A. for 1½ hours on Tuesdays, and with the daughter for 1½ hours on Wednesdays. In awarding Donald one-on-one visitations with each of the children, the court cited the "lack of any evidence from the schools that the visitations were causing [S.A.] increased behavioral problems or any evidence concerning behavioral problems from a party other than [Brandi]." The court found that Schwan's testimony was "unpersuasive" when she opined that one-on-one visitation was not best for S.A.

The court found that the circumstances required using Donald's earning capacity, not actual income, in computing his child support obligation. The court noted that while Donald's changes to lower earning occupations may have been made in good faith, he nonetheless could earn more than he currently was. Additionally, the court held that the children would be seriously impaired as a result of Donald's voluntarily diminished earnings. The court ordered Donald to pay support of $1,503 for three children, $1,302 for two children, and $883 for one child. The court also ordered Donald to pay spousal support of $500 per month for 24 months.

In dividing the parties' property, the court first found that Brandi's expert offered "the most accurate valuation" of the marital home and, thus, valued it at $150,000. The court further found that a $20,000 loan from Donald's IRA account was used to pay gambling debts and, as a matter of equity, "ultimately deprived the marital estate of $20,000 (by virtue of having to be repaid from the marital estate)." Therefore, the court considered that as a $20,000 asset belonging to Donald. Despite a difference of approximately $27,000 in the parties' resulting property division, the court held that no equalization payment from Brandi to Donald was required, because Donald's financial circumstances had resulted in a lower alimony award.

Donald now appeals from the district court's order, and Brandi cross-appeals.

### III. ASSIGNMENTS OF ERROR

Donald alleges that the court erred with respect to its property division in undervaluing the marital home, awarding a $20,000 retirement withdrawal to him as an asset, not accounting for Brandi's student loan payments, and not ordering Brandi to make a property equalization payment. Donald also alleges that the court erred in calculating his child support obligation based on imputed income, not his actual income, and in ordering him to pay spousal support to Brandi.

Brandi alleges on cross-appeal that the court erred in allowing Donald to have one-on-one parenting time with the children, not extending spousal support for longer than 24 months, and not awarding her attorney fees.

## IV. STANDARD OF REVIEW

[1,2] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. *Westwood v. Darnell*, 299 Neb. 612, 909 N.W.2d 645 (2018). This standard of review applies to the trial court's determinations regarding both division of property and alimony. See *id*. A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016).

[3,4] In a review de novo on the record, an appellate court is required to make independent factual determinations based upon the record, and the court reaches its own independent conclusions with respect to the matters at issue. *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017). However, when evidence is in conflict, the appellate court considers and may give weight to the fact that the trial court heard and observed the witnesses and accepted one version of the facts rather than another. *Id*.

[5] In an action involving a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Moore v. Moore*, 302 Neb. 588, 924 N.W.2d 314 (2019).

## V. ANALYSIS

### 1. PROPERTY DIVISION

[6,7] Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. The

first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. *Despain v. Despain*, 290 Neb. 32, 858 N.W.2d 566 (2015). The second step is to value the marital assets and marital liabilities of the parties. *Id*. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Despain v. Despain, supra*. The ultimate test in determining the appropriateness of the division of property is fairness and reasonableness as determined by the facts of each case. *Lorenzen v. Lorenzen*, 294 Neb. 204, 883 N.W.2d 292 (2016).

[8-11] As a general rule, all property accumulated and acquired by either party during the marriage is part of the marital estate, unless it falls within an exception to the general rule. *Westwood v. Darnell, supra*. Such exceptions include property accumulated and acquired through gift or inheritance. *Id*. The burden of proof to show that property is nonmarital remains with the person making the claim. *Id*. As a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Osantowski v. Osantowski, supra*.

### (a) Home Valuation

With respect to the parties' property division, Donald first argues that the district court erred in accepting Brandi's $150,000 valuation of the marital home over his proposed $185,000 valuation. Brandi argues that the district court did not err in accepting her certified appraiser's valuation of the home after observing his testimony. We find no abuse of discretion by the district court and, thus, affirm its valuation of the parties' marital home.

The appraiser testified that the parties' home was worth $150,000 based on his physical inspection. He acknowledged that his valuation was lower than the county assessor's

valuation and explained that county assessors do not make physical inspections of individual homes. The appraiser also testified that the assessor's valuations are usually not 100 percent of a home's value but are within 3 to 5 percent of the full value. Brandi testified that the home's roof was in "horrible shape" and described issues with the windows and chimney as well, all of which were also observed by her appraiser. Meanwhile, Donald based his opinion on the county assessor's valuation of the home at $171,449, coupled with his belief that the assessor's valuation was only 92 percent of the home's actual value. Based on that assumption, Donald valued the home at $185,000. Donald also noted that the home had been appraised at $160,000 in 2012.

While we recognize that the district court accepted the home's lowest valuation, we cannot find that its decision was an abuse of discretion. The district court benefited from observing testimony from Donald, Brandi, and Brandi's appraiser and then determined that the valuation offered by Brandi's appraiser was the most accurate, particularly given the testimony regarding the home's condition. We give weight to the district court's observations and acceptance of the $150,000 valuation and, thus, affirm the property division with respect to the valuation of the marital home.

### (b) IRA Depletion

In dividing the parties' property, the district court allocated an "IRA Loan" valued at $20,000 to Donald, finding that the loan had been used to pay Donald's gambling debts and that its repayment ultimately deprived the marital estate of that value. Donald's arguments on appeal are twofold. First, he argues his gambling expenses were not incurred when the end of the marriage was inevitable and, thus, did not constitute dissipation of marital assets. Second, he argues that the evidence does not show that his gambling losses amounted to $20,000. Brandi argues in reply that Donald's gambling expenses were not incurred for the benefit of the marriage and

that they totaled at least $20,000. We conclude that the district court erred in its property division regarding retirement withdrawals.

[12,13] We begin by reiterating the general rules that all property accumulated and acquired by either party during the marriage is part of the marital estate, unless it falls within an exception to the general rule, and that the burden of proof to show that property is nonmarital remains with the person making the claim. *Westwood v. Darnell*, 299 Neb. 612, 909 N.W.2d 645 (2018). "Dissipation of marital assets" is defined as one spouse's use of marital property for a selfish purpose unrelated to the marriage at the time when the marriage is undergoing an irretrievable breakdown. *Reed v. Reed*, 277 Neb. 391, 763 N.W.2d 686 (2009). As a remedy, marital assets dissipated by a spouse for purposes unrelated to the marriage should be included in the marital estate in dissolution actions. *Id*. The court held in *Reed v. Reed* that disputed bank transfers took place when the marriage was undergoing an irretrievable breakdown, because the transfers were made "specifically *because* [the husband] intended to file for divorce." 277 Neb. at 402, 763 N.W.2d at 695 (emphasis in original).

However, in the present case, there was little evidence that Donald's gambling occurred while the marriage was undergoing an irretrievable breakdown. Although Donald's gambling may have been an issue throughout the marriage, the parties did not separate until 2016, following Donald's affair. Donald testified that a $20,000 loan from his IRA account occurred in 2008 or 2009, 7 or 8 years before the marriage's breakdown. While Donald acknowledged that some of the loan may have been used to pay gambling losses, the evidence indicates that the majority of the proceeds were used for other legitimate purposes. The district court assumed that the $20,000 loan was used to pay Donald's gambling debts and thus assigned it as an asset belonging to him. However, there is little specific evidence that establishes Donald's total gambling debts

during the entirety of the marriage to be $20,000. Even if we were to accept the district court's finding as correct, there is no evidence that the loan or its repayment occurred during a time period in which the marriage was undergoing an irretrievable breakdown.

During questioning from the court, Donald acknowledged that he spent $570 on gambling in February 2017 and $1,762 in April 2017. He also acknowledged that he spent "a few thousand dollars" on gambling in 2014. Similarly, Brandi testified that $2,000 from a withdrawal in 2014 was unaccounted for, which she believed indicated Donald spent the sum on gambling. Therefore, taken together, the record reflects that Donald may have expended approximately $4,300 on gambling. While it may be true that Donald gambled throughout the parties' marriage, leading, in part, to its eventual demise, our record does not reflect that Donald dissipated $20,000 of marital property when the marriage was undergoing an irretrievable breakdown. As such, we find that the district court erred in classifying the $20,000 IRA loan as an asset belonging to Donald.

### (c) Student Loan Payments

In dividing the marital estate, the district court held that Brandi's inheritance and the use of marital funds to repay Brandi's student loan debt "cancel each other" and therefore did not include either in the property division. Donald argues on appeal that the district court erred in not accounting for Brandi's premarital student loan debt that was repaid, in part, with marital funds during the marriage. Brandi argues that the marriage benefited from the debt incurred, because the debt enabled her to obtain a teaching license and employment as a teacher from 1999 through 2006. She also argues that the amount of loan repayments was not sufficiently proved and that the gifts and inheritance that she received during the marriage offset the debt repayments, as the district court found. Although our reasoning varies from that of the district court,

we find no abuse of discretion in its ultimate conclusion and, thus, affirm.

[14,15] In dividing marital property, the first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. *Despain v. Despain*, 290 Neb. 32, 858 N.W.2d 566 (2015). Debts, like property, ought to also be considered in dividing marital property upon dissolution. See *Black v. Black*, 221 Neb. 533, 378 N.W.2d 849 (1985). When one party's nonmarital debt is repaid with marital funds, the value of the debt repayments ought to reduce that party's property award upon dissolution. See *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004).

In *Wiech v. Wiech*, 23 Neb. App. 370, 871 N.W.2d 570 (2015), the trial court's property division upon dissolution did not account for either spouse's premarital debts that were reduced during the course of the marriage using the parties' wages. The wife had a premarital bankruptcy debt that totaled $56,400, while the husband had an unspecified debt of $3,549.95, which he brought to the marriage. On appeal, the wife contended that she paid her debt using only her wages and that the debt was therefore paid without marital funds. We reiterated the general principle that any income accumulated during a marriage is a marital asset. See *Harris v. Harris*, 261 Neb. 75, 621 N.W.2d 491 (2001). Because the trial court did not account for the parties' premarital debts that were paid with marital funds, we remanded the matter with instructions to offset the wife's portion of the marital estate by $56,400 and to offset the husband's portion of the marital estate by $3,549.95. *Wiech v. Wiech, supra*.

Brandi acknowledges that she brought student loan debt to the marriage. This student loan debt enabled Brandi to work as a schoolteacher, both from 1999 to 2006 at the beginning of the parties' marriage and again upon the parties' separation. Any repayments made after the parties' marriage and prior to separation were made with marital funds. The value of those

repayments should therefore reduce Brandi's share of the property division. See *Gangwish v. Gangwish, supra*. We note, however, that the value of Brandi's premarital debt that was repaid using marital funds was not established during trial. The burden of proving the amount of the reduction of Brandi's nonmarital debt during the marriage was on Donald.

Donald opined that $33,000 of Brandi's premarital debt was repaid during the marriage, based on multiplying what he believed the monthly payment to be, $294, by 120 months, notwithstanding the fact that the parties' marriage lasted for longer than 120 months. In her brief on appeal, Brandi accurately points out there was no evidence that the monthly payment was consistent throughout the loan's life, that payments were made every month, or that the loan was never in deferment. A monthly student loan statement dated October 30, 2017, reveals that a total of $35,643 had been paid in interest and $9,494 had been paid toward the principal of the consolidated loan since its inception in 1990. As of October 30, the remaining balance on the loan was $24,105. However, the evidence at trial did not show what portion had been paid during the course of the marriage. Donald did not introduce any documentation that demonstrated what payments were made during the 9 years the loan existed prior to the marriage or what payments were made during the marriage. We find the evidence adduced by Donald to be insufficient to prove his claim.

The facts of this case are analogous to cases in which a party has attempted to claim a nonmarital asset, but could not do so since they were unable to definitively establish the value of that asset. In *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016), the trial court found that crops in storage and the balance of the husband's bank accounts that held the proceeds of past crop sales as of the date of marriage should not be awarded to him as nonmarital property. The Nebraska Supreme Court affirmed the trial court judgment, finding that the husband had not definitively identified the values of his premarital

assets. As a result, since one cannot trace an unknown value of assets, the court found it to be unreasonable to set off a value of assets that is not proved. See, also, *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017).

In *Onstot v. Onstot*, 298 Neb. 897, 906 N.W.2d 300 (2018), the husband testified that he purchased the family home 9 years prior to the marriage. He testified to the purchase price and what he believed to be the amount of the original mortgage. He then testified to what he believed to be the value of the home on the date of marriage but provided no evidence regarding the balance of the mortgage at that time. No documentation was provided to confirm his testimony regarding the date of purchase, the purchase price, the amount of the mortgage, or the value of the house at the time of the marriage. The Supreme Court found that the equity in the residence at the time of the parties' marriage would be a nonmarital asset, which, if established, should be set aside to the husband. However, given the lack of documentation that any equity existed at the time of the parties' marriage, the Supreme Court found that the husband failed to meet his burden of proving that the property was a nonmarital asset.

Most recently, in *Burgardt v. Burgardt*, 27 Neb. App. 57, 926 N.W.2d 452 (2019), the evidence demonstrated that the husband possessed a 401K at the time the parties were married. While the husband testified that the 401K was worth $130,000 at the time the parties were married, he provided no documentation to support his claim. The testimonial evidence raised further questions as to the accuracy of the husband's valuation. Since an initial value could not be determined, it was impossible to determine what, if any, of the 401K was traceable to the time of the divorce. We concluded that since the husband had not proved the initial value of his claimed asset, he had failed to meet his burden of proving that a nonmarital asset still existed.

Here, while we can ascertain that Brandi's student loan is nonmarital, the record before us provides us no way of

knowing how much of the principal and interest paid on the loan was paid during the marriage. Therefore, it is impossible to set off any specific value to Brandi based on marital funds that were used to pay off her student loan debt. We note that Donald's testimony does not match the length of the marriage or the amount of the payment noted on the October 30, 2017, statement. Since we have no evidence which discloses the amount of money paid on the student loan during the marriage, we must find that Donald has failed to meet his burden of proof. As such, though for a different reason than stated by the district court, we find that no amount of payments made on the student loan can be attributed to Brandi as a marital asset.

(d) Equalization Payment

Donald assigns that the district court erred in not ordering Brandi to make an equalization payment based on his contentions addressed above and on the disparate shares of the marital estate that were awarded. We, like Donald, acknowledge that the district court's division of the marital estate does narrowly fall within the general rule that a spouse be awarded one-third to one-half of the parties' assets, because the court awarded approximately 36½ percent of the marital estate to Donald. Our finding above that the district court should not have attributed the $20,000 loan from Donald's retirement account as an asset to Donald requires us to first recalculate the value of the marital estate and then determine what, if any, equalization payment is required to be paid by Brandi.

In the decree, Brandi was awarded net assets of $64,936.67. Donald was awarded net assets of $37,402.57, which, due to our finding above, is reduced to $17,402.57 if no equalization payment is made. Without equalization, Donald's portion of the net marital estate would only constitute approximately 21 percent of the total. We find that amount to be untenable and in need of adjustment. However, we also find that the district court's decision to award Brandi the majority of the marital

estate is supported by the evidence. The major portion of the marital estate granted to Brandi is the marital home, a finding not contested by Donald. Brandi has few liquid assets from which she can pay an equalization payment, particularly given Donald's history of being in arrears on his payment of alimony, child support, and other expenses for the children he was obligated to pay under the temporary order. Brandi will continue to need the marital home for the children's benefit. Thus, we modify the district court's order and direct Brandi to make an equalization payment in the amount of $10,000 in order to bring Donald's share of the marital estate back up to an approximately 33-percent share, thus conforming with the general rule that a spouse should be awarded one-third to one-half of the marital estate.

## 2. Child Support Obligation

Donald argues on appeal that the district court erred in calculating his child support obligation based on his earning capacity instead of his actual income at the time of trial. Brandi argues in reply that imputing a higher income to Donald was appropriate because he voluntarily left more lucrative employment, during which his average annual salary over the past 5 years exceeded $100,000. We agree with the district court and find that imputing a higher income to Donald based on his earning capacity was not an abuse of discretion and, thus, affirm.

[16] The Nebraska Child Support Guidelines state that "[i]f applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities." Neb. Ct. R. § 4-204 (rev. 2016). Use of earning capacity to calculate child support is useful "'"when it appears that the parent is capable of earning more income than is presently being earned."'" *Johnson v. Johnson*, 290 Neb. 838, 848, 862 N.W.2d 740, 749 (2015). Generally, earning capacity should be used to determine a child support obligation only

when there is evidence that the parent can realize that capacity through reasonable efforts. *Id*.

In the present case, Donald's work history shows that he worked a number of jobs in which he earned more than $100,000 per year. In 2013, when Donald left Credit Management, he was earning $112,000 per year. Donald earned a base salary of $70,000 plus commission in 2015 when he worked for Axis Capital, and records showed the couple's income from wages was $132,200 that year, the vast majority of which came from Donald. When he disclosed an affair with a colleague in 2016, his salary was reduced by $2,000 per month. Nevertheless, when Donald voluntarily left Axis Capital, he had earned $98,000 from January through July 2016. Thereafter, Donald worked for a construction company, which paid a base salary of $81,000 per year plus commission, and then he worked for Providence Capital, which paid a base salary of $6,000 per month plus commission. At the time of trial, however, Donald was employed by Hamilton Telecommunications, which paid a base salary of $55,000 per year plus commission. He obtained that job after a brief return to Credit Management, which paid him $50,000 per year plus commission, and a brief stint of self-employment, during which he earned $4,400.

Donald indicated that he left more lucrative employment because he tired of traveling and being away from his children. The evidence does not show the extent of Donald's efforts to obtain more lucrative employment. However, the evidence shows that when Donald maintains a job for more than a year, his income increases substantially by virtue of increased commissions. Much like his past work, Donald's employment with Hamilton Telecommunications at the time of trial was projected to become significantly more lucrative during each subsequent year of employment if he met his sales goals. Based on the historical data contained in the offer letter, Donald has the potential to again have an income exceeding $100,000 per year by his fourth year of employment if he performs according to expectations. We agree with the district court

that Donald's financial position diminished due to his own conduct and decisions to leave more lucrative employment. Given Donald's track record in past sales positions, the self-inflicted nature of his losses of income, and his demonstrated potential to increase his income in his current position, we find no reason to believe that Donald's earning capacity has diminished. We further find that reducing child support would seriously impair the needs of his three children. Accordingly, we find that the district court did not abuse its discretion in relying on Donald's earning capacity in calculating his child support obligation.

### 3. Spousal Support Obligation

Donald argues on appeal that the district court erred in ordering him to pay alimony to Brandi, because they earned similar salaries at the time of trial, he had paid temporary spousal support while the dissolution was pending, and his child support obligation was based on a greater-than-realized income. Brandi argued in reply that alimony was warranted because she had lost out on annual salary increases for the 10 years between S.A.'s birth and their separation that the parties had agreed she would not teach. On cross-appeal, Brandi assigns that the court erred in not ordering Donald to pay her alimony for more than 24 months. We find that the district court did not abuse its discretion in ordering Donald to pay Brandi alimony of $500 for 24 months.

[17,18] "The purpose of alimony is to provide for the continued maintenance or support of one party by the other when the relative economic circumstances and the other criteria enumerated in this section make it appropriate." § 42-365. In dividing property and considering alimony upon a dissolution of marriage, a court should consider four factors: (1) the circumstances of the parties, (2) the duration of the marriage, (3) the history of contributions to the marriage, and (4) the ability of the supported party to engage in gainful employment without interfering with the interests of any minor children in the

custody of each party. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). In addition to the specific criteria listed in § 42-365, in dividing property and considering alimony upon a dissolution of marriage, a court should consider the income and earning capacity of each party and the general equities of the situation. *Anderson v. Anderson, supra*.

[19,20] In reviewing an alimony award, an appellate court does not determine whether it would have awarded the same amount of alimony as did the trial court, but whether the trial court's award is untenable such as to deprive a party of a substantial right or just result. The ultimate criterion is one of reasonableness. *Wiedel v. Wiedel*, 300 Neb. 13, 911 N.W.2d 582 (2018). An appellate court is not inclined to disturb the trial court's award of alimony unless it is patently unfair on the record. *Id*.

Here, the district court awarded Brandi alimony of $500 per month for 24 months, effective August 1, 2018, after entry of the decree of dissolution. We do not find the amount awarded to be excessive, as assigned by Donald, nor do we find it to be insufficient, as assigned by Brandi. At the time of trial, Brandi had secured employment as a teacher earning $56,474.50 per year. We recognize that through the parties' joint decision to have Brandi care for the children full time after they were born, she did lose the benefit of annual step salary increases that she would have received had she remained employed as a teacher. However, we also note that by the time the decree was entered, Brandi had already been awarded alimony at the rate of $1,100 per month for 22 months. Based on the duration of the marriage, Brandi's employment, and other economic considerations, we find no abuse of discretion by the district court. The award of $500 per month for an additional 24 months properly balances the countervailing interests of the parties.

## 4. Parenting Time

On cross-appeal, Brandi assigns that the district court erred in finding that it was in the children's best interests to have

individual visitations with Donald. She specifically argues that one-on-one visitations with Donald were inappropriate for S.A. because of his Asperger's. We find that the district court did not abuse its discretion in allowing Donald to have individual parenting time with each of the children.

[21-24] The trial court has discretion to set a reasonable parenting time schedule. *Schmeidler v. Schmeidler*, 25 Neb. App. 802, 912 N.W.2d 278 (2018). A reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent, and the determination of reasonableness is to be made on a case-by-case basis. *State ex rel. Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004). Parenting time relates to continuing and fostering the normal parental relationship of the noncustodial parent. *Thompson v. Thompson*, 24 Neb. App. 349, 887 N.W.2d 52 (2016). The best interests of the children are the primary and paramount considerations in determining and modifying visitation rights. *Id.*

In the present case, Brandi argues that Donald's individual parenting time with S.A. is detrimental because it exacerbates symptoms of S.A.'s Asperger's. During trial, Brandi presented evidence that one-on-one visitations with Donald oftentimes preceded S.A.'s outbursts. She also offered testimony from a counselor, who treated S.A. and opined that individual visitations were not in S.A.'s best interests. Donald argued that individual parenting time was important because S.A. required more attention than the other children, thus shortchanging the other children of his attention during visitations with all the children. We note that Brandi did not contend that individual visitations for the two younger children with Donald had been or would be detrimental to the children, nor was there any evidence to support such a contention.

Under our standard of review, we do not supplant the trial court's determinations with our own. We are mindful that the district court had the benefit of observing the counselor testify

in the present case before determining that her testimony was "unpersuasive." The decree, which allows Donald to have individual parenting time with each child, is reasonable and preserves the children's relationships with Donald. We further note that there was no evidence presented that S.A.'s one-on-one visits with Donald resulted in misbehavior or diminished performance at school. Much of the counselor's information regarding repercussions of the visits at home appears to be based on the report of Brandi. Therefore, we must give deference to the finding of the district court which gave little weight to the counselor's testimony. We find no abuse of discretion by the district court in ordering Donald to have individual parenting time with each child and, thus, affirm the court's determinations regarding parenting time.

### 5. Attorney Fees

On cross-appeal, Brandi assigns that the district court erred in denying her request for an award of attorney fees but goes on to argue that the court erred only *if* the division of the marital estate is modified pursuant to Donald's appeal.

[25-28] Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Moore v. Moore*, 302 Neb. 588, 924 N.W.2d 314 (2019). A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases. *Id.* Additionally, attorney fees and costs are often awarded to prevailing parties in dissolution cases as a matter of custom. See *id*. See, e.g., *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Id.*

[29] Where a party seeks to recover attorney fees, the best practice will always be to provide an affidavit or other evidence such as testimony or exhibits. *Id*. The filing of an affidavit is not absolutely required, however. *Id*. Litigants who do not file such an affidavit or present other evidence risk the loss of attorney fees because of the difficulty of discerning such information from the record alone. *Id*.

The district court declined to award attorney fees to either party in the present case, noting that an award in favor of Brandi would be inappropriate "given the current relative financial situation of the parties." We conclude that the district court did not err in not awarding attorney fees. Accordingly, we affirm the denial of an award of attorney fees to Brandi.

## VI. CONCLUSION

Based on the foregoing, we affirm the district court's property division with respect to its valuation of the marital home. We further find that Donald failed to prove the amount of money paid from marital funds on Brandi's premarital student loan so as to attribute the amount of any payments made to Brandi as a marital asset. We also affirm the decree with respect to its calculation of Donald's child support and spousal support obligations, parenting time, and attorney fees. However, we find the district court erred in its property division with respect to attributing the 2008 loan taken against Donald's retirement account as an asset to Donald and therefore order Brandi to pay $10,000 to Donald in order to bring the division of the marital estate to a two-thirds to one-third split.

Affirmed as modified.