Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/22/2023 09:06 AM CDT

Timothy J. Novotny, appellant and
cross-appellee, v. Nicole M. Novotny,
appellee and cross-appellant.

___ N.W.2d ___

Filed August 15, 2023.    No. A-22-226.

1. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge. This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees.
2. **Judges: Words and Phrases.** A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition.
3. **Divorce: Property Division.** Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365.
4. **Property Division.** As a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case.
5. **Divorce: Property Division.** Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance.

6. ____: ____. Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property.

7. ____: ____. Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists.

8. **Divorce: Property Division: Proof.** Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. But if the separate property remains segregated or is traceable into its product, commingling does not occur. The burden of proof rests with the party claiming that property is nonmarital.

9. **Divorce: Property Division: Proof: Testimony.** A nonmarital interest in property may be established by credible testimony.

10. **Trial: Witnesses: Evidence.** Triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or the lack thereof.

11. **Appeal and Error.** Error without prejudice is not a ground for reversal.

12. ____. A lower court cannot commit error in resolving an issue never presented and submitted to it for disposition.

13. ____. A party cannot complain of error which the party has invited the court to commit.

14. **Agriculture: Crops: Equity.** Courts are allowed flexibility in their treatment of stored and growing agricultural crops to account for the equities of the situation.

15. **Appeal and Error.** To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

16. **Attorney Fees.** Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits.

Appeal from the District Court for Saunders County: Christina M. Marroquin, Judge. Affirmed.

Shane J. Placek, of Sidner Law, for appellant.

Alex M. Lierz, of Rembolt Ludtke, L.L.P., for appellee.

Moore and Welch, Judges.

Bishop, Judge.

## INTRODUCTION

The Saunders County District Court dissolved the marriage of Timothy J. Novotny and Nicole M. Novotny and divided the parties' property and debts. On appeal, Timothy challenges the district court's decision (1) determining that some or all of certain assets were not premarital, (2) imputing the gross value of the 2020 grain sold after the date of the parties' separation, and (3) regarding the 2021 crop yield from the parties' marital agricultural property. On cross-appeal, Nicole challenges the district court's division of the marital estate and its decision not to order Timothy to reimburse her for health insurance premiums, attorney fees, and expert fees. Although we find merit to some of Timothy's arguments related to premarital and nonmarital property, we nevertheless affirm the court's decree of dissolution for the reasons discussed below.

## BACKGROUND

Timothy and Nicole married in June 2016. They have one child, a daughter, born in 2019.

On March 11, 2021, Timothy filed a complaint for dissolution of marriage and sought joint custody of the parties' daughter, a determination of child support, and an equitable division of the parties' property and debts. In her answer and counterclaim, Nicole sought the same, but she also sought an award of attorney fees and costs. Pursuant to a stipulated temporary order entered on May 17, the parties were awarded joint custody of their daughter with equal parenting time and Timothy was ordered to pay $100 per month in child support. Nicole was ordered to continue to provide health insurance coverage for Timothy during the pendency of the divorce proceedings so long as it remained available to her through her place of employment at a reasonable cost.

Trial was held on December 2 and 3, 2021. Timothy, then 32 years old, and Nicole, then 28 years old, both testified. Numerous exhibits were also received into evidence. The

parties had already entered into a "50/50" joint legal and physical custody parenting plan regarding their daughter; therefore, custody and parenting time were not contested issues at trial. The parties' date of separation was contested, as Timothy testified that the parties separated on March 1, 2021, whereas Nicole testified that the parties separated on February 20.

Timothy testified that he has been a farmer since 2009. The parties married on June 18, 2016, and in November of that year, they purchased 54 acres of land, 47.5 of which were "farmable," for approximately $327,000; Timothy described it as "a dryland farm" and said "it yields comparable to the other dry land in the area." Timothy valued that property at $329,000 as of March 1, 2021; he said he looked at the Saunders County assessor's 2020 value of $237,040, "and then their value is 72 to 73 percent." Nicole testified that she had the land appraised in November 2021 and that it was valued at $345,000. Timothy wanted the marital land awarded to him because it related to his agricultural production activities. The parties presented testimony and exhibits about various other assets and debts at trial. We will discuss the evidence related to the contested issues as necessary in our analysis.

Pursuant to the district court's decree entered on March 3, 2022, and its order nunc pro tunc entered on March 10, the parties' marriage was dissolved, they were awarded joint custody of their daughter with equal parenting time, and Timothy was ordered to pay $44 per month in child support. As relevant to this appeal, the court used March 1, 2021, as the valuation date for the marital estate and divided the parties' property and debts accordingly. As to the disputed property, the court valued the parties' 54 acres of jointly owned farmland at $345,000 and the land was awarded to Timothy along with the associated loan debt. The court found that Jones Bank savings account No. xxx9529 (#9529) should be considered marital property and not Timothy's premarital funds. The court also found that the 2016 crops were marital property. The court determined that the total fair market value of the 2020

soybean crop stored with ADM was $41,107.15. It also determined that the 2021 grain associated with the jointly owned farmland was valued at $47,045 and should be included in the marital estate. Finally, the court determined that only $26,456 of the funds received from trading in Timothy's 2015 Chevrolet Silverado could be set off as a premarital asset. The court valued the marital estate at $515,000, attributing a net marital estate of $412,415 to Timothy and a net marital estate of $102,591 to Nicole. The court awarded 60 percent ($309,000) of the marital estate to Timothy ($515,000 × .60) and 40 percent ($206,000) of the marital estate to Nicole ($515,000 × .40). To achieve that 60-40 distribution, Nicole was awarded a property equalization payment of $103,409 ($103,409 + $102,590 = $206,000). The court ordered each party to pay his or her own attorney fees.

Timothy appeals, and Nicole cross-appeals.

## ASSIGNMENTS OF ERROR

Timothy assigns, consolidated, reordered, and restated, that the district court erred in (1) failing to find that some or all of certain assets were premarital, including his Jones Bank savings account, the 2015 Chevrolet Silverado, and the 2016 net crop proceeds; (2) imputing the gross value of the 2020 grain generally sold after the date of separation without considering the tax consequences; and (3) imputing the yield from the parties' marital agricultural property and disregarding the cost of inputs, taxes, and labor, as well as the risk in production of the 2021 crop.

Nicole assigns on cross-appeal that the district court erred by failing to (1) equitably divide the net marital estate, (2) order Timothy to reimburse her for the cost of his health insurance premium, and (3) order Timothy to reimburse her for attorney fees and expert fees.

## STANDARD OF REVIEW

[1,2] In a marital dissolution action, an appellate court reviews the case de novo on the record to determine whether

there has been an abuse of discretion by the trial judge. *Eis v. Eis*, 310 Neb. 243, 965 N.W.2d 19 (2021). This standard of review applies to the trial court's determinations regarding custody, child support, division of property, alimony, and attorney fees. *Id.* A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Id.*

## ANALYSIS

### General Principles of Law

[3,4] In a dissolution of marriage proceeding, "'[i]f the parties fail to agree upon a property settlement . . . the court shall order an equitable division of the marital estate.'" *Dooling v. Dooling*, 303 Neb. 494, 507, 930 N.W.2d 481, 495 (2019). Under Neb. Rev. Stat. § 42-365 (Reissue 2016), the equitable division of property is a three-step process. *Dooling v. Dooling, supra*. The first step is to classify the parties' property as marital or nonmarital, setting aside the nonmarital property to the party who brought that property to the marriage. The second step is to value the marital assets and marital liabilities of the parties. The third step is to calculate and divide the net marital estate between the parties in accordance with the principles contained in § 42-365. *Dooling v. Dooling, supra*. As a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Id.*

[5] Generally, all property accumulated and acquired by either spouse during a marriage is part of the marital estate. *Dooling v. Dooling, supra*. Exceptions include property that a spouse acquired before the marriage, or by gift or inheritance. *Id.*

[6-8] Any given property can constitute a mixture of marital and nonmarital interests; a portion of an asset can be marital property while another portion can be separate property.

*Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017). Setting aside nonmarital property is simple if the spouse possesses the original asset, but can be problematic if the original asset no longer exists. *Id.* Separate property becomes marital property by commingling if it is inextricably mixed with marital property or with the separate property of the other spouse. *Id.* But if the separate property remains segregated or is traceable into its product, commingling does not occur. *Id.* The burden of proof rests with the party claiming that property is nonmarital. *Id.*

[9,10] A nonmarital interest in property may be established by credible testimony. *Burgardt v. Burgardt*, 304 Neb. 356, 934 N.W.2d 488 (2019). A spouse's own testimony can establish a "tracing link," i.e., tracking an asset to a nonmarital source. *Id.* at 364, 934 N.W.2d at 495 (internal quotation marks omitted). See, also, *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016). Of course, triers of fact have the right to test the credibility of witnesses by their self-interest and to weigh it against the evidence, or the lack thereof. *Burgardt v. Burgardt, supra*. Evidence not directly contradicted is not necessarily binding on the triers of fact, and may be given no weight where it is inherently improbable, unreasonable, self-contradictory, or inconsistent with facts or circumstances in evidence. *Id.*

JONES BANK SAVINGS ACCOUNT

Timothy testified that he brought $106,804 into the marriage that he wanted set aside as his premarital asset. At the time of the parties' marriage in June 2016, that amount was already in Timothy's savings account at Community State Bank, as evidenced in exhibit 48. On August 1, 2016, Timothy withdrew the balance of his Community State Bank savings account, now $104,342, and deposited the funds into Oak Creek Valley Bank. Timothy testified that Oak Creek Valley Bank was later bought by Jones Bank. He stated that Jones Bank savings account #9529 was his individual savings

account and that it contained his premarital funds. Timothy continued to keep that account in his name alone throughout the parties' marriage. He used the account for "[p]aying bills," and it was the cashflow account for his farm.

According to bank records, Jones Bank savings account #9529 had a balance of $181,098.78 as of March 1, 2021, the date of the parties' separation. Between February 20 and March 1, Timothy used funds from the savings account to pay off a $69,714.85 operating note, including interest. He testified that he usually pays off his operating note "after the first of the year when I get grain checks."

After the parties separated, Timothy transferred some of the money from the Jones Bank savings account into Union Bank savings and checking accounts to keep his information private, because Nicole's family members worked at Jones Bank. According to Timothy, the transferred money already appears on his proposed property settlement wherein Jones Bank savings account #9529 was valued at $181,099 as of March 1, 2021; he also included $106,804 from "Community State Bank" as a premarital asset on his proposed property statement.

On cross-examination, when asked if Jones Bank savings account #9529 always had at least $106,000 in it during the marriage, Timothy stated that he did not know. Bank records received into evidence reveal that the account did not always have $106,000 in it during the marriage, and at one point in December 2018, it dipped below $76,000, but it does not appear that the account ever dipped below $75,000. Timothy agreed that during the marriage, marital funds were deposited into the account, and that funds from that account were spent on marital expenses.

Nicole testified that, although it was not reflected in her proposed division of the parties' assets and debts, she at one point in time believed that $75,000 would have been a fair award of premarital credit to Timothy for Jones Bank savings account #9529 because that was the lowest balance the

account ever reached. However, she no longer believed that it was fair to give Timothy a premarital credit, because marital funds were comingled in that account.

The district court found:

> [Timothy] established the specific identified value of the premarital asset as $106,000 and was able to trace that amount to the Jones Bank account. However, once his separate property was in the Jones Bank account it is intermixed with marital property including earnings, tax refunds, and stimulus funds generated by the efforts of both parties. Although the account never dipped below $75,000, it also gained well over $106,000. The gains, given the evidence before the Court, care [sic] attributed in part to marital funds being placed into the account.

The court found that "there appear to be four years of joint marital efforts that increased the balance of the account" and "[t]he evidence establishes the intermingling of marital funds occurred." The court found that Timothy did not meet his burden of proving that Jones Bank savings account #9529 was nonmarital; it was therefore considered marital property.

[11] After reviewing the record, we conclude that while the majority of Jones Bank savings account #9529 was marital property, $75,000 of the account can be traced to Timothy's premarital interest in the account. As stated previously, at one point in December 2018, the value of the Jones Bank account dipped below $76,000, but it does not appear that the account ever dipped below $75,000. Additionally, at one point in time, Nicole believed that $75,000 would have been a fair award of premarital credit to Timothy. Because at least $75,000 of the Jones Bank savings account could be traced to Timothy's premarital funds, that amount should have been set aside as a nonmarital asset, and the district court abused its discretion when it failed to do so. That said, the court did ultimately take into consideration Timothy's premarital funds from the Jones Bank savings account in its overall division of the parties' marital estate, as will be discussed later in

this opinion; thus, the court's failure to set aside the funds as Timothy's premarital asset was not prejudicial and does not warrant reversal. See *Connolly v. Connolly*, 299 Neb. 103, 907 N.W.2d 693 (2018) (error without prejudice is not ground for reversal).

### 2015 Chevrolet Silverado

Timothy asked for a $45,000 premarital credit for his 2015 Chevrolet Silverado. He testified that he bought and paid for the brand new Chevrolet Silverado before the parties' marriage, and they later traded it in for Nicole's 2018 GMC Acadia. Timothy testified that the parties purchased the GMC Acadia for $26,240 (plus $216 in fees; total of $26,456) and that they were given a $45,000 trade allowance. Because the trade allowance was more than the vehicle they were buying, the dealership gave them $18,544 back in cash, which Timothy put in his Jones Bank savings account #9529 at some point. Timothy also testified that they had a $26,456 loan on the GMC Acadia for a short period of time because they "could get a better deal on it" if they financed it. On cross-examination, Timothy testified that the parties financed the GMC Acadia, so he deposited the trade-in amount of $44,300 ($45,000 minus the cost to tint Nicole's vehicle's windows) into his bank account, and then used some of that money to pay off Nicole's GMC Acadia. On redirect, Timothy clarified that the dealer took the Chevrolet Silverado "as a trade-in, cosigned it for me so it was theirs, and then I . . . got the money for it"; he did not get the money right away but had to wait until the Chevrolet Silverado was sold. That money was then used to buy Nicole's vehicle, which is why her vehicle was financed for a while.

Nicole testified that Timothy should receive only a $26,456 credit for his 2015 Chevrolet Silverado trade-in, because that was the purchase amount of her GMC Acadia. She said that the $45,000 "all went into [Timothy's] savings account, and then money from his savings account paid for the [GMC Acadia]" that had been financed.

The GMC Acadia purchase and the Chevrolet Silverado trade-in is reflected in exhibit 50. That exhibit shows that the "Total Cash Delivered Price" of the 2018 GMC Acadia was $26,456 and that the "Trade Allowance" for a 2015 Chevrolet Silverado was $45,000—a difference of $18,544. The exhibit also stated a "Balance Owed on Trade" was $45,000 and the "Unpaid Balance" was $26,456; "Yes" was checked for "Credit Desired."

The district court found that at the time of the marriage, Timothy owned a 2015 Chevrolet Silverado that was later traded in for the purchase of a 2018 GMC Acadia that was awarded to Nicole in the divorce. The court stated that exhibit 71 (copies of checks) confirmed that the parties financed a portion of the GMC Acadia and made payments on the GMC Acadia to a bank. The court determined that "[t]he only traceable amount from the Chevrolet to the Acadia is the $26,456" because "[t]he balance was deposited into the Jones Bank savings account, which has been determined to be a marital fund." Accordingly, the court set off only $26,456 to Timothy as a premarital asset.

Based on our review of the record, we find that the district court did not abuse its discretion in setting aside only $26,456 as Timothy's premarital asset from the Chevrolet Silverado. That was the only amount traceable to the GMC Acadia, and it appears the remaining funds went into Jones Bank savings account #9529, which has already been deemed marital (other than the $75,000 that was Timothy's premarital interest in the account).

## 2016 Net Crop Proceeds

The parties were married on June 18, 2016. Prior to the date of the parties' marriage, Timothy paid various 2016 expenses related to his farming operation, including $82,947.50 cash rent, $18,857.98 for seed, and $4,931.41 for fertilizer. Timothy had an operating note, and expenses were applied against the operating note. He acknowledged that the 2016 crop

would have been harvested during the parties' marriage and that the taxes paid on the 2016 crop would have been paid jointly by the parties because they filed joint tax returns for the relevant years.

On his proposed property settlement statement, exhibit 79, Timothy listed $65,473 in premarital assets for the "2016 Harvest less balance of operating note." This amount was calculated by taking the approximately $168,173 in deposits from the settlement checks Timothy received from the grain sold from his 2016 crop (checks received October 2016 to January 2017) and subtracting the approximately $102,700 operating note balance that existed on the date of the parties' marriage. Timothy sought to have the $65,473 set off as his premarital asset.

Nicole testified that Timothy should not be granted a premarital credit for the 2016 crops because they were harvested during the marriage with her help. She helped "[r]un the grain cart," helped pay for expenses related to the harvest and storage of the crop, and had to pay taxes on the income received in their joint tax returns. Timothy stated that Nicole "never helped with anything with my farming operation" but she did help for a few hours a day or two on property someone else owned; Timothy barter exchanged labor on that property for equipment use.

The district court noted Timothy's reliance on *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017), and *Chmelka v. Chmelka*, 29 Neb. App. 265, 953 N.W.2d 288 (2020), to support his position that he should get a setoff for the 2016 crops. See *Osantowski v. Osantowski, supra* (stored and growing crops on date of marriage were premarital; even though income from stored and growing crops later comingled with marital assets, fairness and reasonableness required setoff of clearly established premarital value in light of short-term marriage of 31 months which spanned only two full crop cycles); *Chmelka v. Chmelka, supra* (husband entitled to setoff for established value of stored grain and

farm inputs—seed, fertilizer, and chemicals—he had prior to short-term marriage). Compare *Brozek v. Brozek*, 292 Neb. 681, 874 N.W.2d 17 (2016) (husband not entitled to set off value of crops he possessed on date of marriage; he could not show actual number of crop bushels harvested year of marriage and relied on acres he farmed and average yield in area; further, he could not identify different permutations premarital property underwent during 20-year marriage; court reasoned husband's reinvestment was mixed with proceeds of marital harvests and subject to vicissitudes of farming economy for nearly 20 years).

However, the district court stated that in both *Osantowski v. Osantowski, supra*, and *Chmelka v. Chmelka, supra*, the husbands had already harvested the grain that they sought to set aside at the time of marriage, a distinguishing fact from the current case. The court stated that although Timothy had already paid inputs for the 2016 crop year out of the farm operating note prior to the parties' marriage, it was after the parties' marriage that the crops were harvested, the income was paid to Timothy, and the operating note was paid down with marital funds. And while the husbands in *Osantowski v. Osantowski, supra*, and *Chmelka v. Chmelka, supra*, came into the marriage with an asset that could be valued with specificity, the court found that "[t]he value of [Timothy's] harvest was unknown, speculative, and could have been a deficit or an asset." The court stated that "Nicole and [Timothy] both bore the risk of what the fruits of [Timothy's] labor, during the 2016 crop year would be" and "[b]oth parties were employed and contributing to the marital estate at the time the operating loan was being paid down." Because "both parties bore the risk of profit or loss, jointly paid tax on the income, and the prepaid expenses were financed through a note that incurred interest during the marriage and was paid down during the marriage by marital funds," the court considered the 2016 crops to be marital property.

Initially we note that the district court misstated the facts in *Osantowski v. Osantowski, supra*. In that case, the husband had both stored *and growing* crops at the time of the marriage. That said, we cannot say that the district court abused its discretion when it did not set off the 2016 grain crop to Timothy as a premarital asset. As noted by the court, both parties bore the risks associated with the 2016 crop, and the operating note was paid down with marital funds; there was also some evidence that Nicole contributed her labor to the 2016 crop.

## 2020 Grain

At the time of the parties' separation in March 2021, Timothy had some 2020 grain stored at ADM and Syngenta, and he agreed that all of that grain was marital property. The parties have no dispute regarding the value of the corn stored at Syngenta and later sold; a total of $73,052. There was also no dispute that $6,648 of corn sold with Frontier was marital. However, there was a dispute over the value of the soybeans stored at ADM that were later sold.

Timothy testified that he had 3,000 bushels of 2020 soybeans stored with ADM that were sold at three different times in 2021 for an average of $13.30 per bushel; a total of $39,900 as reflected on his proposed property settlement. When asked why Nicole had higher prices on her proposed property settlement, Timothy testified that during discovery, he gave the price of soybeans that day; however, he did not sell the soybeans that day because he thought the price would go up. On cross-examination, when asked when he sold the 3,000 bushels of soybeans in 2021, Timothy stated that he "[did not] remember the dates" but "I want to say July was a thousand bushel[s], and then August was possibly another thousand bushel[s], and then I don't remember the last one." He agreed that in July, he sold the soybeans for $14.99 per unit less the storage assessment and inspection fees. When asked how he arrived at the average value for the 3,000 bushels, Timothy said, "I remember one was 1450 [sic], one was

12 — 12 something, and one was 13 something," then said, "so I just averaged them three together," and "[i]t ended up being 1330 [sic]."

Nicole testified that 2,000 bushels of the soybeans should be valued at $14.04 per bushel, less the storage fee expenses, because that was what Timothy disclosed the value to be at the time of discovery. However, Nicole later discovered that the other 1,000 bushels were sold for $14.99 per bushel; therefore, that 1,000 bushels should be valued at the higher amount.

The district court found that 3,000 bushels of soybeans stored with ADM were sold in three separate transactions of 1,000 bushels each. The first 1,000 bushels were sold in July 2021 for $14.99 per unit, and after discounting for the storage, assessment, and inspection fees, the net proceeds were $14,507.15. The court recounted Timothy's testimony in arriving at market value—he averaged all three transactions and arrived at $13.30 per bushel—and said, "[t]he Court accepts [Timothy's] valuation for the remaining 2000 bushel and values it at $26,600.00." Accordingly, the court calculated the total market value of the 2020 soybean crop stored with ADM at $41,107.15.

In his brief on appeal, Timothy claims that the district court abused its discretion in utilizing a higher price per bushel than the evidence indicated. However, based on the record, we find no abuse of discretion as Timothy's "average" pricing was not indicative of the actual sale for at least some of the grain. The district court did the best it could with the evidence before it.

Additionally, as to the $120,627 in 2020 grain (ADM, Sygenta, and Frontier), Timothy claims that it was "unreasonable and patently unfair to assess the full value of the 2020 grain to him without any consideration of tax consequences; and, that it would be more reasonable for the District Court to divide taxable marital assets equally." Brief for appellant at 22-23. "Following such a rule would obligate Nicole to claim 1/2 of the 2020 grain proceeds on her 2020 or 2021

tax returns, depending on the date of sale. Under the existing Decree of Dissolution, [Timothy] is paying income tax on grain that ultimate [sic] goes to Nicole." *Id*. at 23. He suggests that a "[r]easonable solution[] to this issue would result in each party claiming their respective value of the 2020 grain sold on their individual income tax returns; or, [Timothy] would receive a 25% discount" based on his tax bracket. *Id*. at 24.

[12,13] However, as noted by Nicole in her brief, "[Timothy] argues for the first time on appeal that the district court should have separated taxable grain separately from other assets." Brief for appellee at 14. On his proposed property settlement statement, Timothy included all 2020 grain stored and sold postseparation in the marital estate and allocated it to himself. "[Timothy] cannot now claim the district court erred in adopting the proposed distribution of assets and allocation of debts he presented." *Id*. See *Seid v. Seid*, 310 Neb. 626, 967 N.W.2d 253 (2021) (lower court cannot commit error in resolving issue never presented and submitted to it for disposition; moreover, party cannot complain of error which party has invited court to commit). We find no abuse of discretion regarding the district court's valuation and treatment of the 2020 grain.

## 2021 Crop

Timothy claimed that the 2021 corn crop from the marital land should not be considered a marital asset and that Nicole should not be entitled to any of it because she did not pay any of the inputs and she did not do any of the labor; all of the inputs were paid, and his labor expended, after the parties separated, and he took all of the risk if there was not a crop. He explained, "I am not asking for half of Nicole's wages from her work. She was not there helping me do any of the work or paying for any of the bills." Nicole also did not have to pay any of the federal or state taxes for the 2021 crop. Timothy said dry land in the area would cash rent for $220

per acre. So, if the district court were to grant Nicole some income from the land, Timothy would prefer that the court give her one-half of what the cash rent would be for the 47.5 farmable acres.

Nicole testified that she was asking for the 2021 crop to be divided in the marital estate because she was "still owner of the land." While she believed the yield was higher, she was willing to accept Timothy's testimony that there were 188 bushels of corn harvested per acre on the marital land. Nicole valued the corn crop at $5.44 per bushel because "[t]hat was the average price" in October 2021. Nicole clarified that she was not asking the court to include any 2021 crops that were harvested from land rented by Timothy, but only to include crops from the marital land.

Timothy testified that his yield on the parties' marital land was "47 and a half times 188" in 2021. The corn was planted in April, which was after the parties' separation, and he delivered the presold corn in October. Timothy could not remember the contract price for the presold corn but said it would be "the same or less" than the current price of corn. When asked how much less it could be, Timothy replied, "I would say it could be around $5, it could be 40 to 50 cents less."

The district court recognized that the parties separated on March 1, 2021, which was prior to when Timothy planted, sprayed, harvested, and cultivated the 2021 crop. The court also found that the separation occurred prior to when Timothy "pa[id] inputs for the 2021 crop." Further, relying on *Eis v. Eis*, 310 Neb. 243, 965 N.W.2d 19 (2021), the court found that the 2021 crop harvested from the parties' marital farmland was marital property. Relying on Timothy's testimony that he yielded 188 bushels of corn per acre, and Nicole's testimony using 46 acres with a market price of $5.44 per bushel of corn, the court valued the 2021 grain associated with the marital farmland at $47,045.

Although the district court found that the parties were separated prior to when Timothy paid inputs for the 2021

crop, it nevertheless computed a gross value for the crop and did not reduce that value by any expenses or inputs associated with growing and harvesting the crop. We find no fault with the court's decision to decline to reduce the crop value by such costs, because a clear record was not made regarding such expenses. Timothy testified that when the parties separated on March 1, 2021, he had not yet prepaid any expenses (e.g., inputs, fertilizer, seed, cash rent) for that crop year, but he did acknowledge paying off his operating note between February 20 and March 1, 2021, which note had a balance of $69,714.85. The obligation was paid off with funds from the Jones Bank account before the parties separated. It is not clear from the record what farming expenses were included in that operating note; however, exhibit 38 reflects various expenditures for fertilizer, chemicals, and seed, invoiced in January and February 2021, and for which payments of more than $47,000 were made during those same 2 months before the parties separated. It is also unclear from the record whether any of the fertilizer, chemicals, and seed invoiced and paid before the parties separated was attributable to the crops grown on the marital land or the rented land or both. And while exhibit 38 includes copies of checks dated in March after the parties separated for "seed + treatment" and "chemicals," there is again no evidence identifying what portions of those expenses were for only the crops being grown on marital land versus the crops being grown on rented land. Therefore, while it is possible some inputs for the 47.5 marital acres were paid after the parties separated, it is also possible some were paid before the parties separated.

Because the record is unclear on the value of inputs for the 2021 crop grown on the marital land, we conclude the district court did not abuse its discretion by failing to reduce the value of the 2021 crop by any inputs associated with it. We also find no abuse of discretion in the court's decision to accept Nicole's dollar per bushel value for the corn crop. And to the extent that Timothy argues that the district court did

not consider the tax consequences for the 2021 grain, we find no abuse of discretion given that Timothy did not offer any evidence for the possible tax consequences of selling the stored grain. We turn now to Timothy's primary argument related to the 2021 corn crop grown on the marital land.

Timothy contends that Nicole should have received no benefit from the 2021 crop whatsoever. In determining that the 2021 corn crop grown on the marital land was marital property, the district court relied on *Eis v. Eis*, 310 Neb. 243, 965 N.W.2d 19 (2021). In *Eis*, the trial court found that the grain held in storage in 2019 did not yet exist as of the date of the parties' separation in March 2018, but that it was generated in part by the ownership of the marital land and in part by the husband's efforts after the date of separation. The district court valued the grain as of the date of the trial and allocated the value 60 percent to the husband for his efforts postseparation and 40 percent to the marital estate due to the joint ownership of the land that generated the grain. On appeal, the husband argued that the wife should not be entitled to grain proceeds after she filed for divorce and that the district court should have used the date of separation rather than the date of trial as the valuation for the grain awarded; the Nebraska Supreme Court disagreed on both counts.

[14] The Nebraska Supreme Court stated that courts are allowed flexibility in their treatment of stored and growing agricultural crops to account for the equities of the situation and that the district court, in accounting for the equities between the parties, assigned a 60-40 split to the grain: 60 percent solely to the husband as nonmarital property based on evidence that he alone contributed to the farming operations postseparation and 40 percent to the marital estate based on evidence that the crops were grown and harvested as a result of joint marital ownership of the land. The Supreme Court stated, "The fact that [the wife] was not contributing financially to farming operations after [the March 2018 separation date] does not preclude her from receiving a portion of the

2019 grain, because such interest derives from her share of ownership in the real property." *Id.* at 252-53, 965 N.W.2d at 26.

The Nebraska Supreme Court distinguished its decision from prior cases where it considered when crops would be considered marital income. See, *Osantowski v. Osantowski*, 298 Neb. 339, 904 N.W.2d 251 (2017) (analyzed effects of crop harvesting and storage postseparation as it related to marital income where husband owned farmland jointly with brothers but not with wife); *Kalkowski v. Kalkowski*, 258 Neb. 1035, 607 N.W.2d 517 (2000). The Supreme Court said:

In contrast to *Osantowski*, the grain held in storage by [the husband] was harvested from land that was jointly owned by [the wife] herself and was already part of the marital estate. The issue considered by the district court was not one of marital *income*, or whether income transformed the crop into a marital asset, but, rather, the determination and possession of marital property *upon which the grain was initially grown and harvested*. [The wife's] entitlement to the grain does not revolve around the fact that crops depend upon sale for realization as income, because the tangible grain itself is already marital property.

Our holdings in *Kalkowski v. Kalkowski* are distinguished here for the same reason. *Kalkowski* revolved around a determination of crops as income in order to constitute marital property when one spouse otherwise had no claim to the crops, whereas this case was based on a determination that the real property generating the crop was already a marital asset. Other cases addressing crop storage and marital property determinations are distinguishable on this issue where they relate only to premarital property or crops already in storage at the time of marriage. These cases thus do not preclude [the wife] from a share of the grain even when it was produced

during the marriage but harvested and sold, or stored for future sale, postseparation.

*Eis v. Eis*, 310 Neb. 243, 253-54, 965 N.W.2d 19, 27 (2021) (emphasis in original). The Supreme Court further found that using the trial date for valuation was not an abuse of discretion because that was the only date for which evidence of value was given.

In his brief, Timothy relies on *Osantowski v. Osantowski, supra*, for his argument as to why the 2021 crop should not be included in the marital estate. However, as noted above, in *Osantowski*, the postseparation crop harvesting and storage occurred on land in which the wife had no ownership interest. The current case is more in line with *Eis v. Eis, supra*, because the crops were harvested on marital farmland. Like in *Eis*, Nicole's interest in the 2021 crop derived from her share of ownership in the real property on which it was produced. However, unlike in *Eis*, the district court did not allocate any portion of the 2021 crop solely to Timothy as nonmarital property based on evidence that he alone contributed to the farming operations postseparation, after which the remaining portion of the 2021 crop could be allocated to the marital estate based on evidence that the crops were grown and harvested as a result of joint marital ownership of the land. Accordingly, we conclude the district court abused its discretion in treating the 2021 crop solely as a marital asset.

Ordinarily, we would remand this issue to the district court to determine a nonmarital portion and a marital portion for the 2021 corn crop grown on marital land by taking into consideration Timothy's contributions to the farming operations postseparation and setting off a nonmarital portion, by using the cash rent value as proposed by Timothy, or by some other solution to account for the equities of the situation. However, we find that a calculation error in the court's asset and debt table makes it unnecessary to remand the issue. When totaling the assets attributed to Timothy, the court calculated total assets of $712,051. However, our calculations of those

assets total $748,951. This resulted in $36,900 in marital assets not being attributed to Timothy when the court did its final calculations. If that amount is added back in, as it should be, and the $47,045 value for the 2021 corn crop is reduced to reflect some setoff for nonmarital contributions by Timothy, the revised calculations could possibly result in a higher equalization amount owed to Nicole. For example, if on remand the district court followed the *Eis* example and set off 60 percent of the 2021 crop to Timothy as nonmarital and 40 percent as marital, then only $18,818 would be reflected as a marital asset attributed to Timothy instead of the $47,045 currently reflected; this results in $720,724 in total assets apportioned to Timothy. After subtracting his total debts ($273,180) and the premarital setoff ($26,456), Timothy's net marital estate is $421,088 instead of the current $412,415. This results in a slightly higher equalization owed to Nicole. And if Timothy's suggested alternative of a cash rent value is used, then $10,450 (47.5 acres × $220/acre) would be reflected as a marital asset attributed to Timothy instead of the $47,045 currently reflected; this results in $712,356 in total assets apportioned to Timothy. After subtracting his total debts ($273,180) and the premarital setoff ($26,456), Timothy's net marital estate is $412,720, which barely differs from the current $412,415.

Accordingly, we conclude the benefit Timothy received by the district court's mathematical error provides an equitable equivalent to reducing the marital value of the 2021 corn crop. Notably, Timothy's preferred cash rent option for calculating the marital interest results in an almost identical net marital estate for Timothy as the original decree. As a result, any error by the district court related to the 2021 crop was not prejudicial to Timothy and avoids the necessity of a remand.

## Equitable Division of Marital Estate

In her proposed distribution of the parties' assets and debts, Nicole was seeking an equalization payment to ensure that

the parties each got one-half of the marital estate. However, the district court "recognize[d] that Timothy had a significant amount of funds in his savings account when the parties were married" and "[t]hat money, while co-mingled with marital property, contributed to the growth of the marital estate." The court therefore ultimately found that Timothy should be awarded 60 percent of the marital estate and that Nicole should be awarded 40 percent of the estate. As a general rule, a spouse should be awarded one-third to one-half of the marital estate, the polestar being fairness and reasonableness as determined by the facts of each case. *Dooling v. Dooling*, 303 Neb. 494, 930 N.W.2d 481 (2019). Nicole's award was within the generally acceptable range. The district court properly exercised its discretion to consider the equities of the case and to account for Timothy's premarital funds in this manner. Although it does not amount to a perfect setoff of the $75,000 we found traceable to Timothy's premarital funds, the 60-40 allocation resulted in the receipt by Timothy of considerably more in his net marital estate than Nicole. We therefore cannot say the court abused its discretion in the overall division of the marital estate.

[15] To the extent that Nicole argues that the district court erred in including her premarital Jones Bank certificate of deposit in the marital estate, she did not specifically assign such as error. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022).

HEALTH INSURANCE PREMIUM

At trial, Nicole asked that Timothy be ordered to reimburse her for the $3,400 in health insurance premiums that she paid for him since the date of the filing for dissolution; she provided an insurance premium cost breakdown. Timothy stated that he never agreed to reimburse Nicole for his health insurance premiums she paid after the date of separation and

that such reimbursement was not part of their stipulated temporary order. Nicole acknowledged that the parties never reached an agreement on reimbursement prior to the temporary order. And the temporary order does not state that Timothy must reimburse Nicole for his portion of the health insurance premiums.

Pursuant to a stipulated temporary order entered on May 17, 2021, Nicole was to continue to provide health insurance coverage for Timothy during the pendency of the divorce proceedings so long as it remained available to her through her place of employment at a reasonable cost; each party was to be solely and individually responsible for their own respective unreimbursed medical costs. We note that in the relevant temporary child support calculation, Nicole received all of the health insurance deductions.

We find that the district court did not abuse its discretion when it did not order Timothy to reimburse Nicole for the cost of his health insurance premium.

## Attorney Fees and Expert Fees

Nicole argues that the district court abused its discretion in failing to order Timothy to reimburse her for attorney fees.

[16] Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits. *Parde v. Parde*, 31 Neb. App. 263, 979 N.W.2d 788 (2022). In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Id.*

At trial, Nicole asked that Timothy be ordered to pay a portion of her attorney fees because "[w]e spent a lot of time doing a lot of research and . . . fighting over every little penny of the thing when we could have just moved on and made

a better settlement." The attorney's affidavit in support of attorney fees that was received into evidence at trial showed that Nicole had already incurred $20,916.36 in fees and expenses, not including her attorney's anticipated preparation and attendance at trial. Nicole believed that Timothy should have to reimburse her for her attorney fees after October 6, 2021, because that "was our mediation date and it could have been settled at [sic] that date." She had incurred approximately $9,000 in attorney fees and expenses after October 6, and the trial was estimated to cost her about $5,000; she believed Timothy should have been responsible for $10,000 of her attorney fees. On cross-examination, Nicole acknowledged that she was changing the classification of assets in the week leading up to trial.

In her brief on appeal, Nicole argues that she was the prevailing party on all of the contested issues with the exception of the percentage of the division of the marital estate, and that it was an abuse of discretion for the district court not to award any attorney fees to her. However, Timothy argues that "[o]bjectively, [his] position at trial was far closer to the District Court's equitable division of the marital estate" and that "Nicole's argument is undermined by the outcome of trial." Reply brief for appellant at 7. We find that the district court did not abuse its discretion when it ordered each party to pay his or her own attorney fees. And with regard to Nicole's request to "award her attorney's fees in connection with this appeal," brief for appellee at 14, we direct her to Neb. Ct. R. App. P. § 2-106(G) (rev. 2022).

Although Nicole assigned on cross-appeal that the district court abused its discretion when it failed to order Timothy to reimburse her for expert fees (i.e., the land appraisal report), she did not specifically argue the expert fees in her brief on cross-appeal. See *Simons v. Simons*, 312 Neb. 136, 978 N.W.2d 121 (2022) (to be considered by appellate court, alleged error must be both specifically assigned and specifically argued in brief of party asserting error). Nevertheless,

we find that the district court did not abuse its discretion when it did not order Timothy to reimburse her for her expert fees.

## CONCLUSION

For the reasons stated above, we affirm the decision of the district court.

AFFIRMED.

BISHOP, Judge, participating on briefs.